DECISION AND JUDGMENT ENTRY
{¶ 1} Richard A. White appeals his conviction for aggravated murder and raises four arguments. First, he contends that the trial court improperly permitted the coroner to testify that the victim died by means of an intentional wound. He claims that the coroner's testimony was on the ultimate issue of appellant's mens rea. The trial court did not improperly permit the coroner to testify that the victim's wound was intentionally inflicted. Evid.R. 704 allows an otherwise qualified expert to testify as to an ultimate issue. The coroner did not opine as to White's state of mind, but only opined whether the victim's wound could have been accidentally self-inflicted.
 {¶ 2} Second, White asserts that the trial court improperly admitted (1) "voluminous gruesome photographs", (2) writings and drawings that appellant allegedly produced, and (3) a "last minute `jailhouse informant'" to testify. White claims that: (1) the photographs were unduly prejudicial; (2) the writings and drawings were irrelevant because they do not help show prior calculation and design and they were not properly authenticated; and (3) that the use of his jailhouse confession violated his Sixth Amendment rights. The photographs were not unduly prejudicial and they helped illustrate testimony and explain the victim's injuries. White failed to object to the authenticity of the writings and drawings during trial and, thus, waived all but plain error regarding this issue. However, the circumstances in this case do not warrant application of the plain error doctrine. Because the writings and drawings are not relevant to show prior calculation and design, the trial court should not have admitted them. However, the error was harmless. Substantial other evidence supports a conclusion that White acted with prior calculation and design. See our discussion of White's fourth assignment of error. Lastly, White volunteered his confession to a cellmate and no evidence exists that the cellmate was a police informant. Therefore, the court did not err in admitting it.
 {¶ 3} Third, White argues that the trial court incorrectly excluded evidence regarding the victim's lifestyle and character, i.e., that she was a stripper. He asserts that this evidence would help show that the victim accidentally shot herself. However, contrary to White's argument, such evidence is not relevant for that purpose.
 {¶ 4} Fourth, appellant contends that his conviction is against the manifest weight of the evidence and is not supported by sufficient evidence because the state failed to prove that he acted with prior calculation and design. We conclude that the strained relationship between the victim and White, his acquisition of the weapon just one month before her death, his act in placing the gun barrel against the victim's head, and the brutal nature of the killing could be construed by a reasonable juror to conclude that he acted with prior calculation and design. Therefore, we affirm the trial court's judgment.
 {¶ 5} On May 8, 2003, the victim, Teresa Finn (aka Teresa Bishop), suffered a fatal gunshot wound to the head from a .30-.30 caliber Winchester rifle. The result was especially gruesome in that nearly half of her head was blown away and one eye was missing. When law enforcement officers discovered the victim, they noticed that someone had covered her body with blankets and clothing. White, who was her fiancé, became the prime suspect and after a manhunt in the State of North Carolina, law enforcement officers apprehended him.
 {¶ 6} When North Carolina law enforcement officers questioned White regarding the victim's death, he claimed that it was an accident. He explained that while the victim had been reaching under the couch to retrieve a tray upon which she kept some marijuana, the tray clinked against the gun. The victim pulled the gun out, stating that she had told White not to keep the gun there. As she put the butt of the gun on the floor, the gun discharged and a bullet struck her in the head. White explained that he fled the scene because he did not want to be arrested for a probation violation.[1]
 {¶ 7} Subsequently, the Scioto County Grand Jury returned an indictment charging White with aggravated murder with a firearm specification.
 {¶ 8} At trial, the state theorized that White murdered the victim because she intended to sever their relationship. It presented evidence showing that the parties had a stormy relationship and had fought in the days preceding the victim's death. The state presented expert testimony that the fatal gunshot wound was a contact wound, meaning that the gun was pressed against her head when it discharged, and that the wound was not accidentally inflicted.
 {¶ 9} Christa Bishop, the victim's sister-in-law, testified that the victim and White had an off-and-on relationship. She stated that in the days preceding the victim's death, the victim had been staying at Christa's house, instead of at the trailer that she shared with White. The victim told Christa that "she had had enough." Just two days before her death, the victim filled out an apartment rental application. She did not list White's name on the application. The day before her death, White came to the house to see the victim to try to work things out. He told the victim that his mother was buying them a house where they could live. The victim went with White back to the trailer. Later that afternoon, Christa and her husband stopped by the trailer. She could tell that both White and the victim had been drinking. The next morning, her husband went to check on them at the trailer and found a note stating that they went to Oklahoma to see White's sister.
 {¶ 10} Christa's husband, James Bishop, Jr. (Jim), testified that the victim and White had an on-again-offagain relationship. Jim, who was the victim's "halfbrother," stated that in the days before her murder, the victim was staying with him because White had gone out and not returned one night, so she stated that the relationship was over. Jim explained that he saw the rifle at the trailer before. He stated that White pulled it out from under the couch and said it was loaded. Every time Jim saw White pull the gun from under the couch, the hammer was "uncocked," i.e., not ready to fire, and White stated not to pull the hammer back because it is loaded. He examined the gun used to kill the victim and demonstrated to the jury how the safeties would work.
 {¶ 11} Larry Maxton Fuller, who had dated the victim about five years ago, testified that around the beginning of April 2003, he and the victim renewed their relationship. The victim stayed with him a few nights while White was out of town. The next time that she stayed with him, White had returned and Fuller assumed that they had been in a fight because the victim was upset and had bruises on her neck and arm. Fuller testified that approximately twenty-four to twenty-eight days before the victim's death, he went to see the victim at the trailer that she shared with White. She, White, and Fuller sat around drinking beer and talking. White asked Fuller about the victim spending the night at Fuller's house. Fuller stated that White was upset.
 {¶ 12} One of White's neighbors testified that two days before the victim's death, White stopped at his house and indicated that he and the victim recently had been in a fight and that she took off her engagement ring. White thought her action disrespectful, so he poured beer on her. The neighbor also stated that White used his phone to call the victim and left a message on the answering machine begging her to come back to him. White also phoned his sister who lives in Oklahoma and "asked her if he could come down and stay a while, that he needed a place to s[t]ay and he said that he would get a job and support himself." White did not indicate that the victim would accompany him to Oklahoma.
 {¶ 13} Another neighbor testified that on May 6, 2003, she drove White to Portsmouth so that he could pawn a guitar. White told her that he loved the victim, "but he was going to get a bus ticket and leave."
 {¶ 14} Ronald Lee Craig, a mail carrier, testified that he spoke at a gas station with a person driving a minivan similar to the one White drove in the early morning hours of May 8, 2003 after the victim's death. The person asked Craig for directions to the state of Georgia. As they were talking, the person stated that "his old lady usually drives but she is out of her f____ing head today." However, Craig would not positively identify White as that person.
 {¶ 15} Scioto County Sheriff's Detective John Koch, the lead investigator, testified that once North Carolina law enforcement officials apprehended White, he and Captain John W. Murphy drove to North Carolina to retrieve him. There, Detective Koch interviewed White. He gave the following explanation of White's version of the events: "He stated that the shooting was accidental and it occurred after midnight on the previous Wednesday or Thursday. [White] stated that Teresa, the victim, was sitting on the couch rolling a doobie for she and him using some type of tray. [White] stated that when she had finished she placed the tray under the couch and when she did so that this tray clinked against the gun. [White] stated that Teresa pulled the gun from under the couch and was upset about it being there because of the kids. [White] stated she was holding the gun and telling him about it when the gun went off. [White] stated that he went to Teresa and threw the gun aside[;] he stated he knew she was dead and put a blanket over her. He stated that he stayed for around one or two hours after the shooting and was scared about his warrants. He stated that he put laundry over the blood and stuff so that bugs wouldn't get her. [White] stated that he thinks that he went to the Minford Quick Stop before the shooting but wasn't for sure. He stated that Teresa wasn't wearing any rings at all, and the rings were located in the bathroom. [White] stated that he had bought all the rings for Teresa and that the van belonged to Teresa's father. * * * [White] talked about the note he left for Teresa's brother, Jim, and that he wrote it after the shooting. He stated that he wanted to get advice from his mother. I asked [White] about stopping at a gas station and asking a guy for directions and mentioning that his wife usually drives. At that time, [White] said that he never said anything about his wife driving but may have mentioned that his wife was usually with him. [White] stated that he didn't accidentally shoot Teresa, but he shouldn't have put the rifle under the couch cocked and loaded.
* * * *
I asked [White] about the position of Teresa's hands that I had found them in at the scene. [White's] comm[ent] was that he kissed one of her hands before kissing her mouth. He stated he didn't care what Ohio gave him because he couldn't have Teresa back and then his life was nothing. [White] stated that the day of the shooting was one of h[is] and Teresa's best days in that there was no fighting. [White] stated Teresa did have cold feet about moving into the house on Sheepranch. [White] stated that he was on probation in Georgia, North Carolina and Florida and calling 911 would not bring her back. [White] stated that he knew Teresa didn't pull the trigger on the gun, but the gun may have caught on the couch or the laundry. [White] stated that he took the gun because he didn't know what to do with it. He stated that he wanted to see his son and mom and then kill himself. [White] stated he wouldn't have his mom or son if he went to prison for life. [White] stated that he didn't kill himself because he wouldn't go to heaven. I asked [White] about the alleged comment he made to Mr. Craig when asking for driving directions. [White] stated that he didn't make that comment and that would be terrible.
* * * *
* * * [White] then testified that he couldn't really answer and if he did say it, it may have been because it was the truth. [White] added that if he said that, it was taken out of context. [White] stated that he and Teresa shared a fifth of liquor the day of the shooting."
 {¶ 16} The next day, Detective Koch and Captain Murphy returned to Ohio with White and interviewed him again that night. The state played a videotape of the interview for the jury. During this interview, White stated that he and the victim had been living together for almost two years, were engaged for about a year, and his mother was going to buy him and the victim a house. White explained the circumstances leading up to, surrounding, and following the victim's death as follows. Between about 2:00 p.m. to 8:00 p.m. on the day of the shooting, he and the victim spent the day having intercourse and "fooling around." They had been drinking "quite a bit" of beer and whiskey. After 8:00 p.m., White went to the store, and the victim stated that she was going to sleep. When he returned from the store, he watched a movie. White fell asleep during the movie and when the movie was over, they both awoke from sleeping on the living room floor. The victim dressed and they decided they were hungry. The victim prepared leftover spaghetti and frozen fish strips. She asked White if he wanted "to smoke a doobie," i.e., marijuana. He explained that the victim kept her "stash" under the couch on a metal tray and he kept the gun under the couch, "cocked and pulled back to where all you have to do is pull the trigger." The victim clinked the metal tray against the gun and told White that she asked him not to leave it there. White looked back and turned towards the refrigerator. As soon as he opened the refrigerator, he heard the gun discharge. He grabbed the gun and threw it down.
 {¶ 17} In describing the position of the victim's body, White stated that the victim's legs were not completely on the couch and that she was just kind of leaning comfortably. White stated that he grabbed her legs and put her legs on the couch. He then sat there and looked at her. He kissed her and covered her up with blankets and clothing so that "the bugs wouldn't get her" and also because blood was seeping everywhere. He stated that he attempted to wipe blood off of the wall because he did not want the victim's brother to see it.
 {¶ 18} He then decided to leave a note about going to Oklahoma. He explained that he just wanted "911" to go in the trailer and not have her brother walk in and see the victim. He took the victim's driver's license because he wanted a picture of her and he took the rings that he had given her as a memento.
 {¶ 19} White stated that he had the gun for a couple of months. He claimed that when he stored it under the couch, the hammer was back and "one is in the chamber."
 {¶ 20} White stated that he and the victim never smoked the marijuana that night, but they had during the day.
 {¶ 21} He stated that he talked to a guy at the gas station and "told him usually my wife drives the van but now she is out of her head."
 {¶ 22} White explained that he fled because he was on probation: "The way I was looking at it is if I called and I get arrested for my probation violations, not nothing to do with her, just that and I still did the right thing by calling the law, would she be with us today. Would that make any difference on her being alive. I wasn't concerned about me getting charged with murder because that wasn't in my mind. I didn't do it so I wasn't worried about that. * * * I was worried about my probation violation. That is what is going to send me back to prison and she still ain't going to be alive. So that's my why's it's [sic] not going to bring her back to life, and I am still going to be in some kind of trouble. I may not be in trouble for that, but I was still going to be in trouble."
 {¶ 23} After interviewing White, the detective obtained a copy of the autopsy report. It stated that the bullet hit the victim in the right temple area and exited around the center of the forehead. The report also concluded that the gunshot wound was a contact wound, meaning that the barrel of the gun was against her head when it discharged.
 {¶ 24} In contrast to White's explanation, Detective Koch did not notice anything near the couch that could have accidentally pulled the trigger. Moreover, he never located the tray White referred to.
 {¶ 25} The detective collected a box of writings and drawings from the van White took to North Carolina. According to Detective Koch, one of the writings reads: "Look deep into my mask. Listen silent laughs. Skin, bones for cammo. Twisted words, wisdom for ammo. In my mind a steady beat, a chant, a heat, eyes that will lie, a soul that don't cry. Driven by fantasy, die for me. Set me free, * * *, let me be. * * * * Cross my legs, clean my nails, cross my hands, procedure fails. Victims that don't know it, with a smile I show it. The rage is trapped, blinded fury, no wrath, disturbed, * * * feed me, beat me, lifeless, limb bodies, drained, no more pain, suffer, torment, you lucky piece of shit. You are a fool, your ways tired and used, I am not your friend, I am your end. There is no piece [sic] here, I am your fear. I want you to know it, with a smile I will show it. I am evil, I am your roots, I am calm, I am smooth, I want you trapped in my room, * * *, your [sic] doomed. Actions speak loud for the ultimate thriller. Free the killer."
 {¶ 26} Detective Koch described some examples of the drawings. One depicted a scaly head with a long tongue and pointed ears. Another was: "a drawing of it appears to be a female. A naked female. There is some kind of creature with horns, with his hand around her neck from behind and a hand on her hip as if he is choking this female. There is also a faint drawing of something to the right of that. It looks like a head of something. It is hard to see."
 {¶ 27} Detective Koch testified that the statement White gave to North Carolina law enforcement officials differed from the videotaped interview. In the videotaped interview: "[White] stated that he was at the refrigerator and was not actually looking at her when the gun went off. Also, in relation to that, he had showed on that video statement where he was, or the distance he was from those two chairs I had placed there resembling the couch, so he could show me her position. The point there in that video where his distance from those chairs. He says this was the exact distance when it happened that I was from the couch from her, which was approximately six foot in our interview room compared to fourteen foot at the residence from the couch to the refrigerator."
 {¶ 28} Chief Deputy Coroner and Director of Forensic Pathology for the Hamilton County Coroner's Office Dr. Robert Pfalzgraf testified that his autopsy of the victim "showed an obvious injury to the head. It was produced by a gunshot wound which essentially entered through the right temple, went through the skull and the brain and exited in the forehead region." The path that the bullet took "was going from right to left and forward and also somewhat upwards. So if you can imagine a bullet going in the temple right in front of the ear and it coming out the forehead near the midline that's generally the pathway it took, and what the autopsy confirmed is it caused extensive damage to the brain and, of course, part of the skull was missing from the head * * *." Dr. Pfalzgraf stated that "it was quite obvious there was an extensive amount of soot on the bone and on the skin on the edge of the wound not on the skin surrounding, but just on the edge of the wound and on the bone." From this, Dr. Pfalzgraf concluded that the gun had to be pressed against the skin. He stated that "[t]here is no other way that this could have happened." Dr. Pfalzgraf further opined that the wound was intentionally, not accidentally, inflicted.[2]
 {¶ 29} Dr. Pfalzgraf also performed a toxicology screen, which returned negative for drugs, but positive for ethyl alcohol in the amount of .029 percent. He explained that the drug screen would have been positive if the victim had smoked marijuana the day of her death, or even the day before. He stated that the amount of alcohol in her system was equivalent to about one to two beers or one to two shots. He explained that the amount of alcohol stays stable after death, so .029 should represent the victim's level when she died.
 {¶ 30} Ohio Bureau of Criminal Identification and Investigation (BCI) Special Agent Douglas Caplinger testified that his main function was to determine the trajectory of the bullet. Agent Caplinger set up a reenactment to show the trajectory and where the body would have been in relation to the trajectory. He aligned the end of the barrel with the entrance wound and a person, who was approximately the same size as the victim, sat on the couch and attempted to hold the gun in a position that matched the trajectory. The photographs that Agent Caplinger took of the reenactment show that the victim would have had difficulty holding the gun against her head and pulling the trigger. They further show that the butt of the gun could not have been on the floor, as White claimed. Instead, the end of the gun was raised at an angle from the floor.
 {¶ 31} BCI forensic scientist G. Michele Yezzo stated that she analyzed the bloodstains and splatters from the scene. She explained that the blood stains on the victim's t-shirt "are consistent with the deceased's head being oriented in such a way that the blood and matter from the exit wound was directed toward the left side of the collar, the left sleeve and the left shoulder in alignment with the location of the stained patterns of the sofa and wall surface." The blood stains on the victim's jeans are "inconsistent with the staining being deposited with the deceased in the position documented in the photographs. It would be necessary for some time to have elapsed to allow the staining to be soaked into the fabric before the deceased moved or was moved into the position." Yezzo further stated that "the contact or soaked in staining visible on the items covering most of the body are not consistent with the staining being deposited with the items as they are documented in the photographs." She stated that if the staining originated from the victim "it would be necessary for these surfaces to be exposed to an available blood source, a wound, a pool of blood, other source of wet blood prior to being placed over the deceased." Yezzo stated that the victim's head would have been facing left and that it was not possible that the victim's head would have been facing towards the room, away from the couch. Yezzo reported that the victim's head would have been closer to the couch, the horizontal portion, not in a upright, semi-upright, or lounging position.
 {¶ 32} BCI Firearms Examiner William B. Mark examined the 30.30 caliber Winchester Model 1894 rifle that injured the victim. According to his testimony, it is 44 ½ inches long, weighs about 8 ½ pounds, and has a trigger pull of three pounds. To fire it, one must depress a finger lever and then pull the trigger. Mark determined that the gun was in proper working order. He stated that "[t]he only way I could get the gun to fire from the full cocked position was to depress the lever and pull the trigger." He explained that he performed a test with the hammer in the cocked position: "We would drop the gun on the stock. * * * It would fall from the fire position, but every time the hammer fell to the half-cock or safety notch position. I would actually put the hammer in the cocked position and hit the hammer with another hammer and knock it off, and in each and every case the hammer always fell to the half-notch, safety cock position."
 {¶ 33} Mathew Bernhard, who is currently indicted for aggravated vehicular homicide, two counts of felonious assault, aggravated vehicular assault, and failure to comply with the order of a police officer, testified that he was White's cellmate. He stated that White told him "that he had killed his wife."
 {¶ 34} In his defense, White presented witnesses who testified that they saw White after the victim's death and that he was upset and suicidal. He also attempted to show that he and the victim were in love and planned to marry.
 {¶ 35} Brian Monroe, a friend of White's who lives in North Carolina, stated that White stopped at his house after the victim's death. Monroe testified that White appeared distraught and he thought White might kill himself. Monroe also explained that White, who is in the tattoo business, "is very artistic." White writes poems, sings, and plays the guitar.
 {¶ 36} William Z. White, White's brother, testified that he saw White in the days after the victim's death and that White was "very upset." He thought appellant might commit suicide.
 {¶ 37} Wanda White Bishop, White's mother, testified that White and the victim were engaged and that she was going to buy them a house. She stated that she did not notice any problems between them.
 {¶ 38} White's firearms expert, Clifford R. James, testified that he did not find the "grip safety" to be in proper working order. His testing showed that the trigger pull ranged from 1.75 pounds to 3 pounds. James performed the "Remington Sweet Spot Test." He stated that this test is "to see whether or not the hammer would drop with the grip safety engaged." To perform the test, he stood the gun on its end and took both a rubber and wooden hammer and rapped the side of the barrel to see if this would cause the safety to malfunction. James stated that by hitting the side of the barrel, he was able to get the hammer to drop. James stated, however, that if the hammer drops, this does not necessarily mean that the gun will fire because of the "safety notch."
 {¶ 39} The jury subsequently found White guilty of aggravated murder and the firearm specification. The trial court sentenced appellant to life imprisonment with an additional three years for the firearm specification.
 {¶ 40} White appealed the trial court's judgment and raises the following assignments of error: "First Assignment of Error
— The trial court erred in admitting opinion evidence of an expert witness that the alleged victim's injury was caused by an intentional act, because this question was an ultimate one for the jury. Second Assignment of Error — The trial court's denial of defendant's pre-trial motions materially prejudiced his defense. a. The trial court erred by allowing the voluminous gruesome photographs to be admitted into evidence. b. The trial court erred by allowing the drawings purportedly drawn by the defendant and poems/writings written by defendant into evidence. c. The trial court erred by allowing the last minute `jailhouse informant' to testify against defendant. Third Assignment ofError — The trial court erred by excluding evidence regarding the alleged victim's lifestyle and character which would have been consistent with defendant's accident theory of the case.Fourth Assignment of Error — The conviction of the defendant-appellant for the crime of aggravated murder was against the manifest weight of the evidence and was based upon insufficient evidence in that there was no evidence of prior calculation and design."
 I {¶ 41} In his first assignment of error, White argues that the trial court erroneously allowed the coroner to testify that the victim's injury resulted from an intentional act. He contends that the coroner impeded on the factfinder's function to determine an ultimate issue, i.e., whether the gunshot wound was accidental or intentional. He claims: "Dr. Pfalzgraf may testify that [the victim's] death was caused by a gunshot; however, the trial court erred when it allowed him to continue with his opinion and state that the wound was intentionally inflicted. It is outside of Dr. Pfalzgraf's expertise, knowledge, and his province to assign criminal responsibility under the law. The ultimate fact of whether the gunshot wound was intentional was for the jury to determine."
 {¶ 42} A trial court possess broad discretion in determining the admissibility of evidence, including expert witness testimony. See, e.g. State v. Thomas, 97 Ohio St.3d 309,2002-Ohio-1017, 779 N.E.2d 1017, at ¶ 46; State v. Hartman
(2001), 93 Ohio St.3d 274, 281, 754 N.E.2d 1150. Thus, we will not reverse its decision unless the court "`clearly abused its discretion.'" State v. Slagle (1992), 65 Ohio St.3d 597, 602,605 N.E.2d 916 (quoting State v. Hymore (1967),9 Ohio St.2d 122, 128, 224 N.E.2d 126). The term "abuse of discretion" implies more than an error of law or judgment, but instead suggests that the court acted in an unreasonable, arbitrary, or unconscionable manner. See, e.g., State v. Myers, 97 Ohio St.3d 335,2002-Ohio-6658, 780 N.E.2d 186, at ¶ 75; State v. Xie (1992),62 Ohio St.3d 521, 584 N.E.2d 715. Furthermore, when applying the abuse of discretion standard, we may not simply substitute our judgment for the trial court's. See, e.g., State v. Herring
(2002), 94 Ohio St.3d 246, 762 N.E.2d 940; In re Jane Doe 1
(1991), 57 Ohio St.3d 135, 566 N.E.2d 1181.
 {¶ 43} Evid.R. 704 states: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."
 {¶ 44} In Shepherd v. Midland Mutual Life Ins. Co. (1949),152 Ohio St. 6, 87 N.E.2d 156, paragraph two of the syllabus, the court discussed opinion testimony on an ultimate issue: "Where an ultimate fact to be determined by the jury is one depending upon the interpretation of certain scientific facts which are beyond the experience, knowledge or comprehension of the jury, a witness qualified to speak as to the subject matter involved may express an opinion as to the probability or actuality of a fact pertinent to an issue in the case, and the admission of such opinion in evidence does not constitute an invasion or usurpation of the province or function of the jury, even though such opinion is on the ultimate fact which the jury must determine." The court explained the rationale for this rule: "The reason for the admission of expert opinion in such cases, especially as it relates to the cause of injury or death, is that the determination of the issue often depends upon the application of a knowledge of anatomy or organic functions or an experience in a field not possessed by the average juror. Where the opinion of an expert is so admitted upon the ground that it concerns a matter of skill or science, there is in fact no invasion of the province of the jury because the jury itself is not supposed to be competent to deal with such matters without the aid of such opinion. 20 American Jurisprudence 686, Section 817. Of course, the jury must still pass upon the weight and credit to be attached to the opinions given it, weakened or strengthened, as they may be, by cross-examination and by counter or corroborating testimony." Id. at 13.
 {¶ 45} Thus, testimony on an ultimate issue is not per se inadmissible in Ohio. In fact, the Ohio Supreme Court has held that "`expert testimony on the ultimate issue of whether sexual abuse has occurred in a particular case'" is admissible. Statev. Stowers (1998), 81 Ohio St.3d 260, 261, 690 N.E.2d 881
(quoting State v. Gersin (1996), 76 Ohio St.3d 491, 494,668 N.E.2d 486, 488). The court has further permitted expert testimony on the ultimate issue of whether a victim was intentionally killed. See State v. Smith (2002),97 Ohio St.3d 367, 375, 780 N.E.2d 221 (concluding that doctors' testimony that the victim was intentionally killed was admissible under Evid.R. 702 and 704 and explaining that "[s]uch testimony was relevant to describing the circumstances of the victim's death and was proper expert testimony on the nature of the death — i.e., that it was not accidental."); see, also, State v. Nasser, Franklin App. No. 02AP-112, 2003-Ohio-5947 (permitting qualified expert witnesses, including a coroner, to testify that the victim's injuries were intentionally, not accidentally, inflicted).
 {¶ 46} Thus, based upon Smith and Nasser, the trial court in this case did not abuse its discretion by permitting the coroner to testify that the victim's wound was intentional. White's contention that the court improperly permitted the coroner to testify that the victim's gunshot wound resulted from an intentional act because the coroner "has absolutely no specialized knowledge regarding [White's] intentions and feelings" is without merit. This argument essentially asserts that the coroner testified as to his mens rea. After reviewing the abbreviated discussion in the record (see footnote 2, supra), we cannot agree. Instead, it appears that he merely relayed whether the victim's gunshot wound was intentionally or accidentally inflicted. He did not express an opinion as to White's mental state at the time of the victim's death. If fact, he did not express an opinion concerning who discharged the rifle. See Nasser (rejecting a similar argument that the expert witnesses testified as to the defendant's culpable mental state, and instead recognized that such testimony concerns the cause of the victim's death, not the defendant's criminal intent).
 {¶ 47} Accordingly, we overrule appellant's first assignment of error.
 II {¶ 48} In his second assignment of error, appellant contends that the trial court erred by admitting into evidence (1) "voluminous gruesome photographs"; (2) writings and drawings that appellant allegedly produced; and (3) a last-minute "jailhouse" confession. As we previously noted, a trial court possesses broad discretion when determining the admissibility of evidence, and we will not reverse such determinations absent an abuse of discretion.
 A. Photographs {¶ 49} White objected to various photographs depicting the victim at the scene of the incident, which showed half of her head missing, blood splatter, and pieces of brain matter hanging from the ceiling. He also objected to the autopsy photographs. He contends that the prejudicial effect of the photographs outweighed their probative value. He claims: "The utter horror of the pictures served only to inflame the jury and to arouse their sympathy and emotions." Appellant further complains, for the first time on appeal, that the trial court should not have permitted the state to show the pictures using a projector. He argues that the photographs "were enlarged not to illustrate anyone's testimony, but for the purpose of inflaming the jury's passions."
 {¶ 50} Generally, "[a]ll relevant evidence is admissible." Evid.R. 402. However, relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "The rule manifests a definite bias in favor of the admission of relevant evidence. The dangers associated with the potentially inflammatory nature of the evidence must substantially outweigh its probative value before the court should reject its admission." State v. Irwin, Hocking App. Nos. 03CA13 and 03CA14, 2004-Ohio-1129, at ¶ 22 (citing Gianelli Snyder, Baldwin's Ohio Practice, Evidence (2d ed.), § 403.9).
 {¶ 51} Thus, gruesome photographs are admissible unless they are irrelevant or unless their probative value is substantially outweighed by unfair prejudice. "[T]he mere fact that [a photograph] is gruesome or horrendous is not sufficient to render it inadmissible if the trial court, in the exercise of its discretion, feels that it would prove useful to the jury." Statev. Maurer (1984), 15 Ohio St.3d 239, 265, 473 N.E.2d 768; Statev. Woodards (1966), 6 Ohio St.2d 14, 25, 215 N.E.2d 568. Such photographs may corroborate the testimony of witnesses, help establish the intent of the accused, or show the nature and circumstances of the crime. See State v. Jalowiec (2001),91 Ohio St.3d 220, 230, 744 N.E.2d 163.
 {¶ 52} In this case, the trial court did not abuse its discretion by admitting the photographs. Each photograph was relevant. The photographs of the victim at the crime scene and of the pieces of human tissue and other matter displayed how her body was positioned and helped the coroner and the blood stain and splatter expert explain how the victim's head must have been oriented at the time the gun fired. See Maurer,15 Ohio St.3d at 265 (stating that "illustrative photographs are generally admissible"); see, also, State v. Cook (1992),65 Ohio St.3d 516, 522, 605 N.E.2d 70 (holding that photographs that illustrate the testimony of witnesses on the scene are admissible). The autopsy photographs, while undoubtedly gruesome, helped show the path that the bullet took and the nature of the victim's death. See Cook (concluding that photographs illustrating the coroner's testimony were admissible); Irwin, supra (holding that the trial court did not abuse its discretion by allowing photographs depicting the victim's injuries when the photographs helped show the severity of the victim's injuries). They further illustrated the coroner's testimony that there was soot on the bone, which showed that the wound was a contact wound. See Statev. Smith (2002), 97 Ohio St.3d 367, 374, 780 N.E.2d 221
(concluding that the trial court did not abuse its discretion by allowing photographs showing victim's injuries and autopsy slides when the photographs helped the coroner explain his testimony regarding the cause of death). None of the photographs appealed solely to the jury's passion. Thus, the trial court did not abuse its discretion by allowing the state to introduce the photographs.
 {¶ 53} Furthermore, White appears to base his argument upon capital cases, where a stricter evidentiary standard for gruesome photographs exists. See State v. Maurer (1984),15 Ohio St.3d 239, 473 N.E.2d 768. In Maurer, paragraph seven of the syllabus, the court held: "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." Thus, the Evid.R. 403 balancing test in a capital case differs from the one that applies to a non-capital case: "To be admissible in a capital case, the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature. Contrary to the Evid.R. 403 standard, where the probative value must be minimal and the prejudice great before the evidence may be excluded, pursuant to Maurer, if the probative value does not, in a simple balancing of the relative values, outweigh the danger of prejudice to the defendant, the evidence must be excluded."State v. Morales (1987), 32 Ohio St.3d 252, 257,513 N.E.2d 267.
 {¶ 54} Consequently, to the extent that White argues that the probative value did not, under Maurer, outweigh the danger of prejudice, we find this argument meritless.
 {¶ 55} Next, because White failed to object at trial to the state's enlargement of the photographs with a projection screen, we decline to address this aspect of his argument. However, we note that size alone does not render photographs inadmissible and that gruesome photographic projection slides of a victim are not per se inadmissible. See State v. Biros (1997),78 Ohio St.3d 426, 444, 678 N.E.2d 891; State v. Gumm (1995),73 Ohio St.3d 413, 425, 653 N.E.2d 253; State v. DePew (1988),38 Ohio St.3d 275, 282, 528 N.E.2d 542, 551; State v. Thompson (1987),33 Ohio St.3d 1, 9, 14 N.E.2d 407.
 {¶ 56} Therefore, we overrule this portion of White's second assignment of error.
 B. Writings and Drawings {¶ 57} White next complains that the trial court improperly allowed the state to introduce various writings and drawings that law enforcement officers recovered from the van that he drove to North Carolina. He asserts that numerous drawings ranging from Jesus Christ to demons were located among his belongings but the state chose only to use "the prejudicial, inflammatory demonic drawings." He also argues that the writings and drawings were not relevant to show prior calculation and design. He additionally complains that some of the writings and drawings were more than ten years old and that the state did not properly authenticate them.
1. Authenticity
 {¶ 58} White did not object during the trial court proceedings as to the writings and drawings' authenticity. Consequently, absent plain error, he waived this issue. See Crim.R. 52(B). An appellate court will take notice of plain error with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Long
(1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus. Plain error does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been otherwise. State v. Biros (1997), 78 Ohio St.3d 426,678 N.E.2d 891. For the plain error doctrine to apply, an error must exist. Here, the trial court did not err by admitting the writings and drawings. Therefore, the plain error doctrine does not apply.
 {¶ 59} Before a court admits a document into evidence, the proponent must properly authenticate it. See Evid.R. 901(A). The general purpose behind authenticating documents is to prove that they are what the proponent claims them to be. See Evid.R. 901(A); see, also, State v. White (1989), 65 Ohio App.3d 564,572; State v. Palmer (Aug. 29, 1996), Belmont App. No. 89-B-28. Evid.R. 901(A) states "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." See, also,State v. Keith (1997), 79 Ohio St.3d 514, 525, 684 N.E.2d 47.
 {¶ 60} Evid.R. 901(B) lists several methods a proponent may use to authenticate a document by extrinsic evidence: "By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule: (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be. (2) Non-expert opinion on handwriting. Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation. (3) Comparison by trier or expert witness. Comparison by the trier of fact or by expert witness with specimens which have been authenticated. (4) Distinctive characteristics and the like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances. * * * *"
 {¶ 61} Under Evid.R. 901(B)(1), the proponent of the document need only produce "evidence sufficient to support a finding that the matter in question" is what the proponent claims it to be.State v. Easter (1991), 75 Ohio App.3d 22, 25, 598 N.E.2d 845; see, also, State v. Moss (Mar. 15, 1996), Ross App. No. 95CA2089. "[T]his low threshold standard does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that the document is what its proponent claims it to be." Easter,75 Ohio App.3d at 25 (citing Weissenberger, Ohio Evidence (1991), 4-5, Section 901.2). "The evidence necessary to support a finding that the document is what a party claims it to be has a very low threshold, which is less demanding than the preponderance of the evidence." Burns v. May (Apr. 5, 1999), Clermont App. No. CA98-06-046. "Any firsthand knowledge of a writing, however acquired, is an appropriate basis for testimony on the issue of authentication where the testimony logically connects the documents with the issues of the case." Bross v. Smith (1992),80 Ohio App.3d 246, 251, 608 N.E.2d 1175 (quotation omitted).
 {¶ 62} Here, the state properly authenticated the documents. The testifying officer stated he found the writing and drawings among White's other belongings in the van he took to North Carolina. The officer also stated that the documents contained the initials R.A.W., the same initials as White's. Thus, under either Evid.R. 901(B)(1) or 901(B)(4), the trial court did not err in concluding that the documents were properly authenticated.
2. Relevancy
 {¶ 63} White also asserts that the writings and drawings were irrelevant because they do not help show prior calculation and design. We agree.
 {¶ 64} Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Thus, in determining whether evidence is relevant, a trial court first must determine whether the evidence, if introduced, would tend to establish a fact that is material to the action. In assessing whether certain evidence is material, a trial court must evaluate: "the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. What is `in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleadings and controlled by the substantive law." McCormick, Evidence (4 Ed.Strong Ed. 1992) 338, Section 185. Once a court determines that the evidence is material, the court must consider the probative value of the evidence; that is, "the tendency of evidence to establish the proposition that it is offered to prove." Id. at 339. For evidence to have probative force, "the evidence must be more (or less) probable when the disputed fact is true rather than false." Id. If the evidence fails either the materiality or the probative value requirement, the evidence is irrelevant, and Evid.R. 402 requires the trial court to deem it inadmissible.
 {¶ 65} Although the trial court possesses broad discretion when determining the admissibility of evidence, it may not admit irrelevant evidence. In this case, the writings and drawings that the state introduced are not relevant to prove that appellant murdered the victim with prior calculation and design. While admittedly some of the writings and drawings are morbid and demonic, they represent appellant's artistic abilities and do not indicate that through them, he expressed a desire to murder the victim. Simply because a person dabbles in expressing themselves through morbid or demonic thoughts, does not make him a cold, calculating killer. Thoughts are not crimes, but in an appropriate case, thoughts could help show prior calculation and design. This is not one of those cases. Moreover, as appellant notes, he produced not only the morbid and demonic writings and drawings that the state introduced, but he also drew pictures of Christ and wrote poetry about love. Further, no evidence exists that any of the writings or drawings were produced in the months preceding the victim's death, which further indicates that the writings and drawings have nothing to do with appellant's thoughts about the victim. Some of the documents are dated and date back to 1996. Not a single one is dated 2003.
 {¶ 66} Although the trial court improperly admitted irrelevant evidence, given the overwhelming evidence that appellant murdered the victim with prior calculation and design, the error is harmless. See our discussion of appellant's fourth assignment of error.
 C. Jailhouse Informant {¶ 67} White next argues that the trial court abused its discretion by allowing a last minute jailhouse informant, Joshua Williams, to testify. White allegedly told Williams, "They will never let me out because I killed my old lady." Although White objects to Williams' testimony, we have been unable to locate any place in the trial transcript where Williams testifies. Instead, another former cellmate of White's, Mathew Bernhard, testified. As the state notes in its appellate brief, White has not raised an assignment of error concerning Bernhard's testimony,[3]
and, thus, we would be within our discretion to disregard this aspect of the third assignment of error. In the interests of justice, however, we will consider whether the trial court erred by permitting Bernhard to testify. White contends that Bernhard was a state agent at the time he allegedly confessed.
 {¶ 68} When viewing possible invasions of Sixth Amendment rights, use of police informants who deliberately obtain incriminating statements from an accused by surreptitious means without the presence of counsel is no different from direct interrogation by officers who deliberately elicit admissions. SeeUnited States v. Henry (1980), 447 U.S. 264, 100 S.Ct. 2183,65 L.Ed.2d 115. The "concern * * * is secret interrogation by investigatory techniques that are the direct equivalent of police interrogation." Kuhlmann v. Wilson (1986), 477 U.S. 436, 459,106 S.Ct. 2616, 91 L.Ed.2d 364. "It matters not that the informant is directed to ask no questions or that the interrogation is in the form of `conversations rather than direct inquiry. Reviewing courts will look to whether the informant was set on his course by law enforcement officers and whether his interrogation elicited the admissions concerned. If * * * the informant was set on his course by officers and then deliberately elicited the admissions through interrogation, then the determinative issue is whether the Sixth Amendment right had attached. If it had then attached to require the assistance of counsel, suppression of the admissions is required." State v.Willison (May 1, 1990), Miami App. No. 89 CA18 (citations omitted).
 {¶ 69} Here, the record simply does not support White's allegation that Bernhard was a police informant. Bernhard was merely White's cellmate at the time. Absolutely no evidence exists that any state officer encouraged Bernhard to speak to White about the victim's death. Consequently, White's argument that the trial court improperly permitted Bernhard to testify is meritless, and we overrule his second assignment of error.
 III {¶ 70} In his third assignment of error, White argues that the court erred by excluding evidence regarding the victim's lifestyle and character to help show that her death was an accident. White attempted to introduce evidence that the victim was a stripper. He wanted to introduce a photo showing her with $100 bills laying over her body and a matchbook cover of a bar where she danced.
 {¶ 71} We previously set forth the standard of review governing a trial court's decision regarding the admission and exclusion of evidence and will not repeat it here.
 {¶ 72} Evid.R. 404(A) generally prohibits character evidence. Evid.R. 404(A)(2) specifies when a trial court may allow evidence of a victim's character. The rule provides: "(A) Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions: * * * * (2) Evidence of a pertinent trait of character of the victim of the crime offered by an accused * * * is admissible; * * *." However, evidence that is not relevant is not admissible. See Evid.R. 402.
 {¶ 73} In this case, we fail to see how evidence that the victim was a stripper shows that the gun accidentally discharged and killed her. The trial court did not abuse its discretion by refusing to allow White to introduce the evidence.
 {¶ 74} Accordingly, we overrule White's third assignment of error.
 IV {¶ 75} In his fourth assignment of error, appellant claims that his conviction is against the manifest weight of the evidence and that insufficient evidence exists. Specifically, he asserts that the state failed to prove the element of prior calculation and design.
 A. Manifest Weight of the Evidence {¶ 76} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, our role is to determine whether the evidence produced at trial "attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy (1998),84 Ohio St.3d 180, 193, 702 N.E.2d 866. The reviewing court sits, essentially, as a "`thirteenth juror' and [may] disagree with the fact finder's resolution of the conflicting testimony."State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541 (quoting Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211, 72 L.Ed.2d 652). The reviewing court must dutifully examine the entire record, weighing the evidence and considering the credibility of witnesses, keeping in mind that credibility generally is an issue for the trier of fact to resolve. State v.Thomas (1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356; State v.DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The reviewing court may reverse the conviction if it appears that the fact finder, in resolving evidentiary conflicts, "`clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, 78 Ohio St.3d at 387 (quotingState v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717). On the other hand, we will not reverse a conviction if the state presented substantial evidence upon which the trier of fact could reasonably conclude that all essential elements of the offense had been established beyond a reasonable doubt. State v.Eley (1978), 56 Ohio St.2d 169, 383 N.E.2d 132, syllabus.
 {¶ 77} R.C. 2903.01(A) sets forth the essential elements of an aggravated murder offense: "No person shall purposely, and with prior calculation and design, cause the death of another * * *." Here, appellant disputes the "prior calculation and design element.
 {¶ 78} No "bright-line test" exists to "emphatically distinguish between the presence or absence of `prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." State v.Taylor (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82; see, also,State v. Coley (2001), 93 Ohio St.3d 253, 263, 754 N.E.2d 1129. "`[P]rior calculation and design' requires `a scheme designed to implement the calculated decision to kill.'" State v.D'Ambrosio (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909
(quoting State v. Cotton, 56 Ohio St.2d at 11,381 N.E.2d at 193). Additionally, three factors may help in determining whether prior calculation and design exists: (1) whether the accused and victim knew each other, and, if so, whether that relationship was strained; (2) whether the accused gave thought or preparation to choosing the murder weapon or the murder site; or (3) whether the act was drawn out or whether it was an almost instantaneous eruption of events. These circumstances may coincide to support the conclusion that the crimes were committed with prior calculation and design. State v. Braden, 98 Ohio St.3d 354,2003-Ohio-1325, 785 N.E.2d 439.
 {¶ 79} Here, the jury did not create a manifest miscarriage of justice by convicting White of aggravated murder. The state presented substantial evidence upon which the jury reasonably could conclude that White committed the offense with prior calculation and design. First, the victim and White had a strained relationship. Before the victim's death, White admitted that they had fought. A neighbor overheard White asking his sister whether he could come to Oklahoma and stay with her. He did not mention the victim going with him. White told another neighbor that he planned on leaving town. A few days before her death, the victim stated that her relationship with White was over. The victim's brother and sister-in-law both testified that the parties had a rocky relationship. Second, White acquired the gun used to kill the victim approximately one month before her death and he kept the gun in a spot where he knew the victim kept her marijuana. This helps show that he gave thought to choosing the murder weapon and that he gave thought to placing the weapon in a spot where he could later claim that the victim found it and accidentally shot herself. Third, White placed the gun barrel against the victim's head, showing that he had sufficient time to think about the act. See State v. Goodwin (1999),84 Ohio St.3d 331, 703 N.E.2d 1251 (concluding that placing gun against the victim's head required thought and helped support proof of prior calculation and design).
 {¶ 80} Additionally, the following facts help establish that White committed the murder with prior calculation and design. The victim's death was brutal and instantaneous. White's explanation that her death was an accident is inconsistent with the physical evidence. The evidence shows that the victim died of a contact wound to the right temple and that her head was facing toward the inside of the couch when the bullet struck. See, e.g., State v.Campbell (2000), 90 Ohio St.3d 320, 330, 738 N.E.2d 1178, cited with approval in Braden, supra (firing shots into a victim's head at close range showed prior calculation and design). The position in which law enforcement officers discovered her body was not consistent with the blood and splatter evidence, thus suggesting that her body was moved after her death. All of the foregoing facts help show that White committed the murder with prior calculation and design.
 {¶ 81} Consequently, White's conviction is not against the manifest weight of the evidence.
 B. Sufficiency of the Evidence {¶ 82} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id. (citing Jacksonv. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781,61 L.Ed.2d 560).
 {¶ 83} The same rationale we used to determine that White's conviction is not against the manifest weight of the evidence also applies to his claim that the state failed to present sufficient evidence to support his conviction. For those same reasons, sufficient evidence exists to support his conviction.
 {¶ 84} Therefore, we overrule White's fourth assignment of error and affirm the trial court's judgment.
Judgment Affirmed.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J. Abele, J.: Concur in Judgment and Opinion. Harsha, J.: Concurs in Judgment and Opinion as to Assignments of Error I and III; Dissents as to Assignments of Error II and IV.
Kline, Presiding Judge, Harsha, Judge, Abele, Judge.
[1] Appellant's statement reads: "I, Rich Austin White was at home with my fiancée Teresa Dale Bishop the other day. We made love on and off from 2:30 in the afternoon until around 8:00 p.m. that night. After we made love Teresa went to sleep and slept for a couple of hours. Teresa then got up and made us some fish strips to eat. I put in a movie; I can't remember the name of it. I went over to the couch and kissed her while she was rolling us a dubby [sic] to smoke and I started walking towards the kitchen and I heard Teresa say I told you not to keep the gun under here because of the kids. I turned around and started walking back towards her and she pulled the gun, a 30-30-caliber rifle out from under the couch and she put the but [sic] of the gun down on the floor. Before I got to her the gun went off. Teresa started to say something else but I could not make out what it was. I reached over and grabbed the gun and threw it over to the side and then I grabbed her. Teresa only had one eye and I knew she was dead because she did not make any noise or shake or anything like people say. I sat there for a couple of hours talking to her and trying to figure out what I was going to do because I am on the run for a probation violation and I didn't want to be arrested for that. I also took a blanket and covered her up. I decided to go to Georgia to my mother's house. I called my mother, Wanda White and I told her what had just happened and she told me to call the police but I told her that I wanted to come home first. My mother called the police in Ohio and told them that Teresa was dead inside the trailer. I took the gun and some cloths [sic] out of the house and started to Georgia and on the way stopped in North Carolina to see my son and ex-wife. I visited a few old friends and that's when I was picked up by the Sheriff's Office."
[2] The prosecutor asked the coroner: "And in your opinion, Doctor, all the years of experience that you have had, all the autopsies that you have done, is it your opinion that this was an intentional wound?" Over White's objection, the coroner answered, "Yes."
[3] Appellant did not file a reply brief that could have responded to the state's observation that Williams did not testify.