[Cite as *State v. Rogers*, 2022-Ohio-4535.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-210666 |
|  |  | TRIAL NO. B-2005302 |
| Plaintiff-Appellee, | : | |
|  |  | |
| vs. | : | *O P I N I O N.* |
|  |  | |
| ROBERT ROGERS, | : | |
|  |  | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 16, 2022

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *William Gallagher*, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1} After entering no-contest pleas, defendant-appellant Robert Rogers was convicted of carrying concealed weapons, improperly handing firearms in a motor vehicle, and having weapons under disability. Before entering his pleas, Rogers moved to suppress a loaded firearm that the police found in the glove box of his vehicle during a search after a roadside stop that lasted over 11 minutes, claiming the police conduct violated his constitutional right to be free from unreasonable searches and seizures. The trial court denied Rogers's motion, and he challenges that decision in this appeal.

{¶2} We affirm the trial court's judgment upon our determination that the firearm was located during a *Terry* investigative stop for carrying a concealed weapon, the scope and duration of which were reasonable under the totality of the circumstances and, therefore, Rogers's constitutional rights were not violated.

## I. Trial Court Proceedings

{¶3} Rogers's weapons charges arose from his encounter with several law enforcement officers on October 9, 2020. The record demonstrates that members of the Cincinnati Police Department's Gun Crime Task Force ("Task Force"), comprised of plain-clothed and uniformed officers, along with special agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), were focused on a gathering of approximately 40 people on Irving Street in what appeared to be a block party in the area around the Colonial Village Apartments. As explained by Lieutenant David Schofield and Officer Thomas Chiappone, the only witnesses at the suppression hearing, the area was considered a "high crime area" and targeted by the Task Force due to "unusually high numbers of violent crim[inal] activities, shootings, gun runs, [and] shots fired." Additionally, the Task Force had received "multiple requests from

the community [in general], and from the neighborhood liaison unit that works closely with the community in [the police district], to give that specific location attention."

{¶4} Beginning at dusk, Lieutenant Schofield in plainclothes conducted surveillance of the gathering using binoculars from a covert vehicle parked on the east side of the street. Within minutes of his arrival on Irving Street, Lieutenant Schofield observed "at least two people who were openly carrying firearms" at the gathering. Thereafter, he saw Rogers "arrive in a dark-colored Lincoln MKZ," eventually parking on the opposite side of the street "approximately 60 yards away" with the Lincoln "facing" towards the plainclothes officer.

{¶5} Next, Lieutenant Schofield saw Rogers exit from the driver's side of the vehicle and "step towards where the group was gathered," "hesitate[] for a second," and "step[] back." After Rogers pivoted back to the vehicle, Lieutenant Schofield saw Rogers "[r]each[] into the passenger's compartment of the vehicle, and then move[] his right hand toward his abdominal area, and appear[] * * * to be placing an item in his waistband area."

{¶6} The driver's side door obscured Lieutenant Schofield's view of Rogers's waist area during those movements, but when Rogers closed the door and headed to the gathering, Lieutenant Schofield saw a "suspicious bulge" in the front center location of Rogers's waist area.

{¶7} Suspecting that Rogers had unlawfully concealed an "unholstered" firearm in his waistband, Lieutenant Schofield relayed this concern through the covert radio channel to the other Task Force officers in the area. He also relayed his observations with respect to the individuals he had seen openly carrying firearms.

{¶8} While Rogers was at the gathering, Lieutenant Schofield continued surveillance on him and did not see any action indicating that Rogers had discarded the object in his waistband. After a few minutes, Rogers returned to his vehicle and drove away. At least one individual seen openly carrying firearms left as well in a white Chevy Impala. A Task Force officer in an unmarked police car followed the vehicles until uniformed Task Force officers using stop sticks effectuated an investigative stop of the vehicles based on the information from Lieutenant Schofield.

{¶9} Once Rogers stopped, Officer Chiappone, wearing a body camera, approached Rogers's vehicle with his gun drawn and instructed Rogers to show the officers his hands. Rogers, who was surrounded by an ATF agent and several police officers, complied with that request, and identified himself. When asked, Rogers denied having a weapon and did not mention anything about a concealed-carry permit. A search of Rogers's information into a police data base revealed no warrants or a concealed-carry permit.

{¶10} During the stop, Rogers told the officers he was "scared" and that he just wanted to go home. Officer Chiappone told Rogers that they were concerned about firearms in the area and that if Rogers did not have a firearm he could leave. When an ATF agent asked Rogers if he had a firearm, Rogers replied that he had been in an "area where a lot of stuff was going on" and it "gets crazy" so he left. In response to Rogers's request to go home, Officer Chiappone told Rogers three times that he could go home if he would agree to voluntarily exit from the vehicle and consent to a check for weapons on his person and the "immediate area" inside the vehicle. Rogers repeatedly refused, again indicating that he was "scared" and "didn't know what was going on," and pointing out to the officers that there were no firearms visible in his

4

vehicle. Officer Chiappone told Rogers that, if he did not give consent, then they would "get into the car with a canine sniff," and which way they proceeded "was up to Rogers." Rogers maintained his position.

{¶11} About eight-and-one-half minutes into the stop, when a canine officer arrived, Officer Chiappone ordered Rogers out of the vehicle for the canine sniff. After Rogers exited, Officer Chiappone placed him in handcuffs and patted him down as a canine officer spoke to Rogers about the canine's ability to alert on certain drugs. Officer Chiappone found no weapon but continued his conversation with Rogers about the firearm investigation. Around 11-and-one-half minutes into the stop, when Officer Chiappone was called away to another investigation, the canine alerted on the outside of the vehicle and an officer other than Officer Chiappone then searched the glove box and found the firearm that resulted in the charges against Rogers. The officers did not find any drugs inside the vehicle.

{¶12} Officer Chiappone testified that the circumstances warranted an investigative stop and a protective search for weapons, and that his investigative approach was tailored to "deescalate" the situation which involved a "very nervous" individual suspected of having a firearm. Officer Chiappone's body-worn camera recording of the stop was admitted into evidence at the suppression hearing and confirms that Rogers was "very nervous" during the stop.

{¶13} Rogers sought exclusion of the firearm on the ground that the stop of his vehicle and the search of his glove box were conducted in violation of his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 10 of the Ohio Constitution. The state at the suppression hearing did not offer probable cause from the canine alert as the justification for the warrantless search.

5

Instead, the state asserted that the stop and search were lawful because the Task Force had reasonable suspicion to stop Rogers for illegally carrying a firearm and to perform a protective search during that investigative stop.

{¶14} At the conclusion of the hearing, Rogers conceded that if the Task Force officers had reasonable suspicion that he had concealed a firearm then, consistent with *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Task Force officers could have effectuated an investigative stop and performed a protective search for weapons during a brief detention. He argued, however, that the officers knew they lacked reasonable suspicion to believe he was armed and that was why they sought consent and brought over a canine for a search, thereby engaging in an illegal "fishing expedition."

{¶15} The trial court did not question the witnesses' credibility and adopted historical facts that mirrored Lieutenant Schofield's and Officer Chiappone's testimony. Concluding that the Task Force officers had reasonable suspicion to perform a *Terry* investigative stop to determine whether Rogers was illegally armed, the "temporary nature of the detention satisfied the ultimate test of reasonableness," and the protective sweep of the vehicle occurring during the "brief inquiry" was lawful, the trial court denied the motion to suppress.

{¶16} Rogers now appeals, advancing three assignments of error all challenging the denial of his motion to suppress.

## II. Analysis

{¶17} The Fourth Amendment to the United States Constitution secures the right to be free from an unreasonable search or seizure and requires a warrant to be particular and supported by probable cause. *Accord* Ohio Constitution, Article I,

6

Section 14. Stopping a vehicle and detaining its occupants is a "seizure" under the relevant constitutional provisions. *See Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Thus, generally, police may not make random stops of vehicles. *See id*. at 663.

{¶18} Here, the trial court determined the police recovered the firearm during a stop and search authorized by *Terry* and its progeny. Under *Terry*, the police may temporarily detain an individual for an investigation without violating the Fourth Amendment when an officer has reasonable suspicion based on specific and articulable facts that criminal activity has occurred or is imminent. *See Terry*, 392 U.S. at 30, 88 S.Ct. 1868, 20 L.Ed.2d 889. Further, if the officer is "justified in believing" that an individual may be "armed and presently dangerous," the officer may conduct a limited protective search of the individual for concealed weapons. *Id*. at 24, cited in *State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 9. Generally, searches and seizures that extend what is permitted by *Terry* must be supported by probable cause. *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶19} The reasonableness of a vehicle stop is measured by the same standards set forth for investigatory stops in *Terry*. *See, e.g., Prouse* at 663 ("[W]e hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574,

7

45 L.Ed.2d 607 (1975) ("For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining  persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."); *accord State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 23.

{¶20} Further, the United States Supreme Court has held that during a lawful roadside *Terry* stop, when the officer has reasonable suspicion that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer and or others, he may conduct a limited protective search of the vehicle's passenger compartment for concealed weapons.  *Michigan v. Long*, 463 U.S. 1032, 1049-1050, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), citing *Terry* at 21 and 27.  The Ohio Supreme Court has also allowed limited protective searches of vehicles during a roadside *Terry* stop.  *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph two of the syllabus.

{¶21} A protective search for weapons may occur at the end of a stop because an officer may reasonably fear that a suspect in the officer's control during the *Terry* detention may use the weapon to injure the officer if permitted to reenter his vehicle at the conclusion of the stop.  *See Long* at 1051-1052; *State v. Williamson*, 2d Dist. Montgomery No. 25479, 2014-Ohio-325, ¶ 26.  ("The officers reasonably believed that, for their safety, it was necessary to search the Bonneville to ascertain whether there was a weapon that could be accessed by Williamson, if he were released, or by others in the area.").

{¶22} Under *Terry*'s framework, the investigative stop must be both justified at its inception due to reasonable suspicion of criminal activity and reasonably related

in scope to the circumstances that justified the interference in the first place. *Terry*, 392 U.S. at 20, 88 S.Ct. 1868, 20 L.Ed.2d 889. Thus, a vehicle stop is limited in scope and degree of intrusion by its purpose and may last no longer than reasonably necessary to effectuate the purpose of the stop. *See State v. Rodriguez*, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015); *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

**{¶23}** Reasonable suspicion is an objective standard that requires more than a hunch. The officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). But officers "need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), cited in *State v. Wright*, 1st Dist. Hamilton No. C-210486, 2022-Ohio-2161, ¶ 16.

**{¶24}** Finally, reasonable suspicion must be considered under the totality of the circumstances, considering all the information available to law enforcement officials at the time. *See Arvizu* at 273. Officers are entitled to draw on their own experiences and specialized training to make inferences from and deductions about the presenting information. *Id.* "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir.2008).

**{¶25}** Evidence derived from a search or seizure that violates the Fourth Amendment is subject to exclusion at trial. *See Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶26} Appellate review of a motion to suppress presents a mixed question of law and fact. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, cited in *Wright* at ¶ 11. We must accept the trial court's findings of fact as true if competent, credible evidence supports them. *Id.* Then we must independently determine whether the historical facts satisfy the legal standard, *id.*, mindful to "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

{¶27} Rogers maintains that Lieutenant Schofield's observations were not sufficient to establish the necessary reasonable suspicion to justify an investigative stop of his vehicle. Additionally, Rogers argues that even if the stop was justified at its inception, the officers impermissibly extended his detention for a canine sniff to obtain probable cause to search his vehicle.

## A. Reasonable Suspicion to Stop

{¶28} In this case, considering the totality of the circumstances, we agree with the trial court that the initial stop fell within the parameters of a lawful *Terry* stop based on a suspicion of criminal activity. The cumulative observations of Lieutenant Schofield constituted an objectively reasonable basis for the fellow Task Force officers to temporarily detain Rogers to determine if criminal activity was afoot, i.e., whether he had brought a concealed firearm to the street gathering. *See In re M.P.*, 1st Dist. Hamilton Nos. C-130663 and C-130741, 2014-Ohio-2846, ¶ 10 (Under the "fellow officer's rule," a police officer's reasonable, articulable suspicion can be transferred to another officer.).

{¶29} Initially, Lieutenant Schofield explained that the area in which the surveillance occurred was a high-crime area, relaying with detail that the area was currently plagued by firearm crimes. He further testified that he had observed at least two people openly carrying firearms at the gathering, and he described the time of day as dusk, which is a time of day when weapons could easily be hidden. He also asserted that he had about 15 years of experience as a police officer and numerous years in the surveillance of drug and weapon activity, experience that included extensive training in firearm use and identification as well has "hundreds" of firearm investigations, seizures, and arrests. Relatedly, Lieutenant Schofield testified to his knowledge of how firearms are carried and concealed by individuals. Finally, he testified to his observation that Rogers pivoted from his path to the gathering where others were openly carrying firearms, reached back into his vehicle to grab something from the passenger compartment, put something in his waistband, and then appeared with a "suspicious bulge" in the center of his waistband.

{¶30} At the suppression hearing, Lieutenant Schofield physically demonstrated the location of the bulge and explained that the location was where one would likely stash a firearm because it provided the necessary stability to secure a firearm. He additionally explained that it was not a likely place to stash other items such as a cellphone. Finally, Lieutenant Schofield testified that he continued to surveil Rogers and that at no point before leaving did Rogers appear to discard what Lieutenant Schofield believed was a firearm.

{¶31} Rogers acknowledges that a bulge in a suspect's clothing is a fact that can lead to reasonable suspicion to support an investigative stop for weapons when an officer observes additional facts. *See Golden v. United States*, 248 A.3d 925, 942

11

(D.C.Cir.2021), citing *United States v. Richmond*, 924 F.3d 404, 411-412 (7th Cir.2019); *United States v. Aitoro*, 446 F.3d 246, 249, 252-254 (1st Cir.2006); *State v. Henson*, 1st Dist. Hamilton No. C-210244, 2022-Ohio-1571, ¶ 31 (Noting the officers did not observe a bulge in suspect's clothing that would have been indicative of him concealing a weapon.); *In re J.C.*, 1st Dist. Hamilton Nos. C-180478 and C-180479, 2019-Ohio-4815, ¶ 22 (Noting the absence of facts such as an observed "bulge" in pants when determining that the officer lacked reasonable suspicion to stop and investigate for carrying a concealed weapon.); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 54 L.Ed.2d (1977), ("The bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat-down.' "), cited in *United States v. Roggeman*, 279 F.3d 573, 580 (8th Cir.2002).

**{¶32}** Rogers argues, however, that it was not reasonable for Lieutenant Schofield to infer the bulge was a firearm without any distinctive behavior present in other cases. *See State v. Phillips*, 155 Ohio App.3d 149, 2003-Ohio-5742, 799 N.E.2d 653, ¶ 32 (2d Dist.). In *Phillips*, the court held that "[b]ulging pockets don't connote crime or weapons when they have no specific nexus to criminal activity." Like in *Phillips*, Rogers contends the bulge observed by Lieutenant Schofield was more likely something innocent, as Rogers was simply observed attending a block party with families.

**{¶33}** The facts in this case are distinguishable from *Phillips*, where the bulge was in a pocket. Here, the bulge was observed in the front center portion of Rogers's waistband. Officer Schofield relayed that in his experience the front central area of

12

the waistband, effective in keeping an unholstered firearm concealed but steady, is the likely area to conceal an unholstered firearm but not a cellphone or radio.

**{¶34}** Importantly, Lieutenant Schofield linked the suspicious bulge to the other observed facts that created the totality of circumstances upon which the propriety of the stop must be considered. This included that he had seen two individuals openly carrying weapons at the gathering. Further, he saw Rogers obtain the object creating the bulge by pivoting away from the direction of the party and reaching into the passenger side of his vehicle from the driver's side door. And Rogers's actions occurred in an area notorious at that time for firearm crimes.

**{¶35}** Rogers also argues the court should not accord much weight to the fact that the investigation took place in a high-crime area. The Ohio Supreme Court, however, recently reaffirmed that "[a]n officer's experience with criminal activity in an area and an area's reputation for criminal activity are factors" that are relevant to the reasonable-suspicion analysis. *See Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, at ¶ 12. The law requires consideration of these "contextual factors." *Id.* at ¶ 15. Ultimately, we conclude Rogers's assertion that Officer Schofield needed more information to conclude that the bulge was a firearm is not supported by the case law.

**{¶36}** Rogers additionally argues that even if the officers had reasonable suspicion that he was armed, there was no evidence that he was illegally armed. This argument relates to the possibility that Rogers had a concealed-carry permit at the time of the stop that would have legalized his behavior if the firearm he was suspected of carrying was a handgun. Rogers did not raise this argument below and instead conceded that *Terry* would govern if the officers' suspicion that he had concealed a

13

firearm was reasonable. Because Rogers's current argument is contrary to Rogers's position in the trial court, it cannot be raised now. *See State v. Curry*, 1st Dist. Hamilton No. C-210274, 2022-Ohio-627, ¶ 15. Thus, we refrain from addressing this argument with respect to Rogers's challenge to the propriety of the stop.

{¶37} In summary, we conclude that, considering the totality of the circumstances, the Task Force officers possessed reasonable suspicion of criminal activity related to the illegal possession of a firearm to initiate the investigative stop.

## B. Duration of the Stop

{¶38} Rogers argues also that the Task Force officers unlawfully prolonged the investigative stop for the sole purpose of creating probable cause to search his vehicle through a canine sniff. A seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes on interests protected by the Constitution. *Rodriguez*, 575 U.S. 348, 135 S.Ct. 1609, 191 L.Ed.2d 492; *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005). Rogers's argument requires an inquiry that focuses on the scope of the stop, including the duration of the detention.

{¶39} With respect to investigative stops in general, the scope must be reasonably related to the circumstances that justified the stop in first place, and "the investigative methods employed should be the least intrusive means reasonably available to dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S at 500, 103 S.Ct. 1319, 75 L.Ed.2d 229.

{¶40} In determining the reasonable duration of stop, we must examine "whether the police diligently pursued a means of investigation that was likely to

14

confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe,* 470 U.S. at 686, 105 S.Ct. 1568, 84 L.Ed.2d 605; *Rodriguez* at 354. However, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe* at 687. This inquiry affords deference to methods selected by trained officers in the field, prohibiting "unrealistic second guessing." *See id.* at 686.

{¶41} Rogers relies primarily on *United States v. Rodriguez* in support of his argument that the duration of the stop was unreasonable, and therefore, the firearm recovered during that illegal detention should be suppressed. The *Rodriguez* Court addressed whether the police may delay the duration of an investigative stop for a traffic violation, even for just a small amount of time, to wait for a drug sniffing canine, absent any articulable suspicion to believe that there are drugs in the vehicle. The Court concluded that unless police have "reasonable suspicion" to investigate for drugs, it is an unconstitutional seizure for them to extend a legal traffic stop for the sole purpose of conducting a canine sniff. *See Rodriguez*, 575 U.S. at 358, 135 S.Ct. 1609, 191 L.Ed.2d 492. *Accord State v. Wood*, 5th Dist. Licking No. 2021CA00082, 2022-Ohio-2548, and *State v. Neyhard*, 11th Dist. Ashtabula No. 2021-A-0005, 2022-Ohio-1098.

{¶42} This case is distinguishable from *Rodriguez*, *Wood*, and *Neyhard*. Rogers's stop was initiated for the investigation of a firearm offense, an inherently dangerous situation, and not a traffic offense. Courts have long recognized that the government's interest in officer safety is "legitimate and weighty" and that interest justifies certain "negligibly burdensome precautions in order to complete [the] mission safely" that are not justified by "the Government's endeavor to detect crime in

15

general." *Rodriguez* at 356-357. Officer Chiappone testified to his safety concerns and that his approach to delay ordering Rogers out of the vehicle was to "deescalate" an unsafe situation. Rogers repeatedly indicated that he did not want to exit from the vehicle and was extremely nervous. The steps Officer Chiappone took were designed to "gauge" Rogers's "nonverbal clues" to his requests, aiding the officer's "assess[ment] [of] the situation." Officer Chiappone further articulated at the suppression hearing the risk to officers during a stop "if someone was armed and had a malicious intent." Ultimately, Officer Chiappone wanted to make sure that "everybody went home."

{¶43} We have already held that the Task Force officers had reasonable suspicion to make the stop to investigate whether Rogers unlawfully concealed a weapon. Nothing during the stop dispelled that suspicion. Ultimately, *Terry*'s test for determining whether a lawful investigative stop is converted into an arrest-like detention is "whether the degree of intrusion into the suspect's personal security was reasonably related to officers' suspicions and the surrounding circumstances." *Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, at ¶ 21.

{¶44} Based on Officer Chiappone's testimony, as well as the video recording of the stop, we conclude that Officer Chiappone's concern for safety during the investigation into the weapons offense drove the method of the investigation. Unlike in *Rodriguez*, the seizure was not prolonged for the sole purpose of a dog sniff, but to ensure the safety of the officers and Rogers. We conclude the selected method was objectively reasonable and diligent and, though, it resulted in a detention of more than 11 minutes, the Task Force officers did not extend the stop beyond what is lawful under *Terry*.

16

### III. Conclusion

{¶45} In sum, the totality of the circumstances in this case leads us to conclude that the scope and duration of the detention and search of the glove box met the Constitution's standard of reasonableness. Considering the foregoing analysis, we overrule all of Rogers's assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

MYERS, P.J., concurs.
CROUSE, J., dissents.

**Crouse, J.**, dissenting.

{¶46} Because Robert Rogers's detention and the subsequent search of his vehicle violated the Fourth Amendment to the United States Constitution, I respectfully dissent.

{¶47} The only criminal activity suspected of Rogers in this case was that Rogers *may* have been illegally carrying a concealed weapon. At the time that Rogers was stopped by the police, carrying a concealed weapon was not illegal, *unless* he did not have a concealed-carry permit, was a convicted felon, or was otherwise legally prohibited from doing so. The investigating officer did not know who Rogers was and did not have any information that suggested Rogers was not permitted to carry a firearm. The investigating officer did not suspect that Rogers had committed any other crime, nor were the police looking for a suspect for a crime that had been recently committed. It was not as if the police were investigating shots fired in the vicinity and saw Rogers suspiciously running away in the dark of night in a high-crime area. I find this information significant in determining the reasonableness of Rogers's detention and in evaluating the totality of the circumstances.

17

**{¶48}** The officer testified that he observed Rogers reach into the passenger compartment of his car and, based on Rogers's upper body movement, the officer believed that Rogers placed an object into his waistband area. The officer testified that in his experience, the waistband "is consistent with where people place firearms when they do not have a holster." However, the officer did not see Rogers's waistband or the suspected object. The officer testified that Rogers's "actual waist was not in [his] view. It was behind the door of the vehicle." The officer further testified that he observed "for less than a second" "a suspicious bulge in the front of his waist area." According to the officer, the bulge was "somewhere in the front center of his body" "at waist level." When specifically asked by the prosecutor, "And did you see the shape of a handle of a firearm?" the officer responded, "I saw what I believed to be a bulge." The officer further testified that he had "no recollection" of a bulge when Rogers came back to his car, even though that was the reason the officer gave to the other officers to pull Rogers over. The observations of this very experienced officer were made in a "high crime area," at dusk, after the officer observed two people openly carrying firearms.[1]

**{¶49}** Thus, Rogers was detained due to the investigating officer's view of a nondescript bulge in Roger's waistband and his hunch that Rogers may be illegally carrying a concealed weapon. The law is clear that a person cannot be detained based on "inarticulate hunches." *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "And simple ' "good faith on the part of the arresting officer is not enough." * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons,

---

[1] "Ohio is an open carry state. Thus, in basic terms, in Ohio, it is generally legal to walk down the street and openly carry a handgun * * * ." *See State v. Massingill*, 8th Dist. Cuyahoga No. 109818, 2021-Ohio-2674, ¶ 15.

18

houses, papers, and effects," only in the discretion of the police.' " *Id.* at 22, quoting *Beck v. Ohio*, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), quoting *Henry v. United States*, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). It is also important to remember that "[t]here is no 'automatic firearm exception' to the *Terry* rule." *Northrup v. City of Toledo Police Dept.*, 785 F.3d 1128, 1132 (6th Cir.2015), citing *Florida v. J.L.*, 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000).

{¶50} The majority opinion emphasizes that it was the totality of the circumstances that justified the stop. According to the majority, these circumstances were a nondescript bulge, the officer's extensive experience, the high-crime area, the impending darkness, and the legal open carry of firearms by two other people on the street. But the only circumstance specific to Rogers was the bulge in his waistband.

{¶51} The facts that it was dusk and that Rogers was in a "high crime" area known for gun violence are "contextual factors" not specific to Rogers and, while relevant to the reasonable-suspicion analysis, do not provide a sufficient basis to conclude that Rogers himself was illegally carrying a concealed weapon. *See State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, 126 N.E.3d 1132, ¶ 71 (Stewart, J., dissenting) ("In the absence of any objective, articulable facts reasonably linking Hairston in particular to the gunshots, contextual factors such as the time of day and the area's reputation are of scant analytical value."), citing *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."); *United States v. Young*, 707 F.3d 598, 603 (6th Cir.2012) ("We have warned that contextual factors, such as high-crime, should not be given too much weight because they raise concerns of racial,

ethnic, and socioeconomic profiling."); *Bennett v. City of Eastpointe*, 410 F.3d 810, 830 (6th Cir.2005) ("While officers can surely and appropriately take into account the fact that an area is a high crime area, that alone, does not justify effectuating a seizure.").

**{¶52}** Regarding the one fact specific to Rogers–the bulge—I am not aware of any case that has held that simply observing a nondescript bulge in a person's waistband, absent any other suspicious behavior, amounts to a reasonable articulable suspicion to support a *Terry* stop *for illegally carrying a concealed weapon*.

**{¶53}** In *State v. Taylor*, 8th Dist. Cuyahoga No. 92382, 2009-Ohio-5822, ¶ 7, the officer testified that "she observed the handle of a gun protruding from Taylor's waistband." She observed this handle "on a clear night with good visibility," in a "high crime area" after observing the defendant 'for five minutes'." *Id.* at ¶ 4. The fact that the officer observed a part of the gun was the key to the court holding that the officer had a reasonable and articulable suspicion that Taylor might be carrying a concealed weapon. *Id.* at ¶ 7-8 ("After observing the gun handle, Murphy formed a reasonable and articulable suspicion that Taylor might be engaged in criminal activity."). This was emphasized by then-Judge, now Justice Stewart, in her concurrence when she noted:

> Unlike cases in which an officer sees a misshapen bulge in clothing or one pocket of a coat riding lower than another, the description of a gun handle provides a *degree of specificity* which led to a reasonable suspicion that Taylor was carrying a concealed weapon.

(Emphasis added.) *Id.* at ¶ 11. She further explained:

20

In this case, the suspicion that Taylor might be concealing a gun was more than conjecture—the undercover officer saw the shape of a gun handle, not just an amorphous bulge, sticking out from beneath Taylor's shirt.

*Id.* at ¶ 19; *see State v. Moyer,* 10th Dist. Franklin No. 09AP-434, 2009-Ohio-6777, ¶ 25 ("Indeed, in what may be the most glaring factor, Officer Alli testified that when she saw defendant running, she also saw defendant holding what she believed to be a firearm.  An officer's seeing an object the officer reasonably believed to be a firearm in a person's hand creates reasonable, articulable suspicion that defendant is, or is about to be, engaged in criminal activity, namely carrying a concealed weapon."); *United States v. Capozzoli,* E.D.Mich. No. 22-20005, 2022 U.S. Dist. LEXIS 137103, *11 (Aug. 2, 2022) ("Having *seen* a concealed weapon, the officers had reasonable suspicion to investigate whether Defendant in fact had a firearm on his person, including by approaching him and asking Defendant questions." (Emphasis sic.))

**{¶54}** Cases that have found a bulge in a person's pocket or clothing to be enough to justify a stop for suspicion of illegally carrying a concealed weapon have required that the bulge be described as having the obvious shape of a gun.  *See, e.g., United States v. Bell*, 572 Fed.Appx. 417, 419 (6th Cir.2014) ("The officer's belief, based on his eyewitness observations, that the defendant had *a bulge in his pocket that was in the shape of a gun* provides 'reasonable suspicion' under the *Terry* doctrine that the defendant was carrying a concealed pistol.  Defense counsel does not argue that carrying such a concealed weapon in Michigan is legal, but rather that simply having his hand on a 'bulge' in his pocket is not sufficient to trigger a valid *Terry* stop.  *Here, however, the testimony was that the 'bulge' was in the shape of a gun*." (Emphasis

21

added.)); *United States v. Pope*, 212 Fed.Appx. 214, 217 (4th Cir.2007) ("Both [officers] personally observed what they knew to be the *outline of a gun* concealed beneath defendant's clothing." (Emphasis added.)); *United States v. Bontemps*, 977 F.3d 909, 917 (9th Cir.2020) (Noting that the officer's bodycam footage "shows a gun-shaped bulge" and stating that "[t]he dissent is * * * incorrect in implying that our holding allows any bulge of any kind to justify a *Terry* stop. Our holding is instead that a bulge suggestive of a firearm can be sufficient to create reasonable suspicion, and that in this case there was ample evidence from which to conclude that Bontemps's 'obvious' bulge was likely a concealed firearm."); *Golden v. United States*, 248 A.3d 925, 942 (D.C.2021), quoting *Singleton v. United States*, 998 A.2d 295 (D.C.Cir.2010) ("[T]he bulge [the officer] saw on Mr. Golden's right hip was not in the shape of a gun and was not distinctive in any way * * *. A generic bulge in the location the officer saw it 'can be explained by too many innocent causes to constitute reasonable suspicion' by itself. When we and other courts have held it reasonable to infer that a bulge in a suspect's clothing was a firearm, there were additional observed facts about the bulge, the suspect's actions linked to it, and/or other circumstances that supported the inference."); *In re Jeremy P.*, 197 Md.App. 1, 19, 11 A.3d 830 (2011) ("Here, there was no proof of a describable object that reasonably could have been suspected of being a gun. [The officer] neither saw the outline of a gun, nor any part of what appeared to be a gun. Significantly, he was completely unable to describe the bulge."); *United States v. Jordan*, N.D.Ga. No. 1:08-CR-369-JOF-RGV, 2009 U.S. Dist. LEXIS 145607, *3 (Oct. 6, 2009) (holding that the stop of the defendant was legal because the officer "did not simply observe a bulge," rather he testified that "he saw in defendant's pocket a bulge that looked like a handgun.").

{¶55} In this case, the officer saw a nondescript bulge in Rogers's waistband for "less than a second." When asked by the prosecutor if he saw the shape of a handle of a firearm, the officer merely replied, "I saw what I believed to be a bulge." The fact that the officer was experienced and made this observation at dusk, in a "high crime" area, does not turn his belief that Rogers was carrying a concealed firearm into anything more than an inarticulate hunch.

{¶56} It is important to emphasize that Rogers was stopped *solely* because the police suspected he was illegally carrying a concealed firearm. Rogers was not suspected of any other crime. Under the law in effect at the time Rogers was stopped, there was a presumption that carrying a concealed firearm was illegal. This is because a concealed-carry permit was an affirmative defense to a charge of carrying a concealed weapon. Therefore, some Ohio courts have held that the police may briefly detain someone whom they reasonably believe is possessing a concealed weapon to determine whether they are legally carrying it. *See, e.g., Taylor*, 8th Dist. Cuyahoga No. 92382, 2009-Ohio-5822, at ¶ 8 ("Because Murphy did not know whether Taylor had a permit, she had a reasonable suspicion that he might be carrying a weapon illegally"); *see also Moyer*, 10th Dist. Franklin No. 09AP-434, 2009-Ohio-6777, at ¶ 25 ("An officer's seeing an object the officer reasonably believed to be a firearm in a person's hand creates reasonable, articulable suspicion that defendant is, or is about to be, engaged in criminal activity, namely carrying a concealed weapon."). *But see Taylor* at ¶ 12, (Stewart, J., concurring) ("This resolution means that an officer's knowledge, or lack thereof, regarding the legal status of a person carrying a concealed weapon–without more–will always be sufficient to articulate a reasonable suspicion that the person's concealed carry is illegal. It is difficult to reconcile this analysis in

23

light of the concealed-carry laws."); *State v. Price-Williams*, 973 N.W.2d 556, 576 (Iowa 2022) (Appel, J., dissenting) ("An argument can now be made that with so many persons lawfully possessing handguns, authorization of law enforcement to search a person for possession of a weapon amounts to a type of general warrant that the Fourth Amendment was designed to prevent.")[2]

**{¶57}** The majority opinion holds that a police officer may conduct an investigative stop of any person present in a high-crime area when it is dark if that officer observed some sort of nondescript bulge in the person's waistband that, based on his experience, he believed to be a gun. No further information about the bulge, that person, suspicious behavior, or investigation of a crime in the area is necessary. Pursuant to all relevant caselaw, such a determination exceeds the bounds of *Terry* and eviscerates our Fourth Amendment protections. That the officer's hunch ultimately proved to be correct in this case cannot justify the fact that Rogers's Fourth Amendment rights were violated. *See, e.g., In re M.P.*, 1st Dist. Hamilton Nos. C-130663 and C-130741, 2014-Ohio-2846, ¶ 11 (holding that "[a]lthough the soundness of Detective Longworth's hunch of M.P. was borne out by the end result," the stop of the defendant nevertheless violated the Fourth Amendment).

---

[2] As of June 13, 2022, a permit is no longer required for a "qualifying adult" to carry a concealed handgun. *See* 2022 Sub.S.B. No. 215; R.C. 2923.111(B). This statutory change will make it even more difficult for our police to protect our citizens from gun violence because arguably they will no longer be able to use the presence of a concealed weapon as the sole basis for detaining an individual. *See, e.g., Northup v. City of Toledo Police Dept.*, 785 F.3d 1128, 1132 (6th Cir.2015), quoting *United States v. King*, 990 F.2d 1552 (10th Cir.1993) (holding that officers did not have a reasonable suspicion that Northup was engaged in criminal activity when officer saw a gun on his hip because open carry of a firearm is legal in Ohio and holding that "[t]o allow stops in this setting 'would effectively eliminate Fourth Amendment protections for lawfully armed persons.' "); *see also* Fields, *Stop and Frisk in a Concealed Carry World*, 93 Wash.L.Rev. 1675, 1687 (2018) ("The U.S. Supreme Court's recent decisions recognizing an individual's Second Amendment right to keep and bear arms for personal protection and concurrent increase in the number of states authorizing concealed and open carry of firearms in public has forced a reexamination of traditional stop and frisk jurisprudence.").

**{¶58}** For these reasons, I respectfully dissent.

Please note:

The court has recorded its entry on the date of the release of this opinion.