[Cite as *In re T.B.*, 2026-Ohio-1309.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: T.B. | : | APPEAL NOS. | C-250279 |
| | | | C-250288 |
| | : | TRIAL NOS. | 24/2312-01 X |
| | | | T/24/1379-01 X |
| | : | | |
| | : | | *JUDGMENT ENTRY* |
| | : | | |

This cause was heard upon the appeals, the records, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court appealed in the case numbered C-250279 is affirmed, and the judgment of the trial court appealed in the case numbered C-250288 is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed in both cases under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/10/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *In re T.B.*, 2026-Ohio-1309.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE: T.B. | : | APPEAL NOS. | C-250279 |
| | | | C-250288 |
| | : | TRIAL NOS. | 24/2312-01 X |
| | | | T/24/1379-01 X |
| | : | | |
| | : | *O P I N I O N* | |
| | : | | |

Appeals From: Hamilton County Juvenile Court

Judgments Appealed From Are: Affirmed in C-250279;
Reversed and Cause Remanded in C-250288

Date of Judgment Entry on Appeal: April 10, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Appellee State of Ohio,

*Raymond T. Faller*, Hamilton County Public Defender, and *Margaret Kane*, Assistant Public Defender, for Appellant T.B.

**CROUSE, Presiding Judge.**

{¶1}     T.B., a juvenile, and three of his friends were stopped for jaywalking. T.B. was frisked and a gun was found on his person. T.B. was adjudicated delinquent for jaywalking and carrying a concealed weapon. He now appeals, arguing that the gun should not have been admitted into evidence, that the State failed to show that the gun was operable, and that the juvenile court should have permitted T.B. to withdraw his plea of "admit" entered in the jaywalking case.

{¶2}     After reviewing the record, we disagree with his arguments about the concealed-carry adjudication: the gun in that case was not seized in violation of the Fourth Amendment, was adequately authenticated, and was sufficiently shown to be operable. We therefore affirm the dispositional order appealed in the case numbered C-250279. However, we agree that the juvenile court abused its discretion by failing to permit T.B. to withdraw his plea in the jaywalking case, so we reverse the dispositional order appealed in the case numbered C-250288.

## I.  BACKGROUND

### A.  *Stop, Search & Arrest*

{¶3}     On October 29, 2024, Officers Hoffbauer and Dezarn sat in an unmarked vehicle wearing plain clothes. Officer Hoffbauer saw four young Black men "loitering" outside of a Hook Fish and Chicken restaurant in Avondale. One of those young men, T.B., was wearing a baggy, dark-brown sweatshirt. Another of the young men wore a lighter, tan hoodie. The remaining two young men were dressed in black hoodies.

{¶4}     Officer Hoffbauer later testified that she observed conspicuous bulges in the "waistband areas" of T.B. and the young man in the tan hoodie, which she described as "very consistent with carrying a firearm." She also testified that the two

exhibited "furtive movements," which she described as grabbing at their waistband areas, as if to check that a firearm was still there.

{¶5} Officer Hoffbauer testified that she watched as these four young men crossed the street unlawfully—either outside of the crosswalk or within the crosswalk but without a walk light. She put a call out on her radio to nearby uniformed officers, informing them of the jaywalking violation and the alleged bulges.

{¶6} Officer Chitwood responded to her call, and his body-worn camera ("BWC") recorded the subsequent encounter. He approached the four young men in front of a building, which he later identified both as "a community center" and "a church and daycare type facility." Officer Chitwood informed the four young men that he was stopping them because they had not used the crosswalk. When T.B. objected that they had used the crosswalk, Officer Chitwood replied that they didn't have the light.

{¶7} Officer Chitwood testified that, at the time he initiated the interaction, he observed a very large bulge on the young man in the tan hoodie. He asked if the four young men were minors and learned they were.

{¶8} As Officer Chitwood waited for other officers to arrive, T.B. placed his hand on the handle of the community center's door, which was apparently locked. T.B. saw someone through the glass and beckoned for them. When the person inside opened the door, T.B. stepped in slightly. Officer Chitwood told T.B. to "hold on one second," at which point T.B. complied and planted himself firmly outside the threshold. T.B. proceeded to tell the individual inside to "get Pastor Tate." T.B. then leaned calmly against the open door, his body toward Officer Chitwood.

{¶9} By this point, backup had arrived, so Officer Chitwood began patting down the young man with the tan hoodie and conspicuous bulge. He felt something

that he believed to be a firearm, and a firearm would later be recovered from the young man by another officer. Officer Chitwood then left the man in the tan hoodie with another officer and turned his attention to T.B. He placed T.B. in handcuffs and frisked him. As he felt along the front of T.B.'s left pants leg, Officer Chitwood stated, "He's got it right here." According to trial testimony, the officers recovered a handgun from deep within T.B.'s clothes—beneath T.B.'s jeans and basketball shorts, "tucked in[to] his underwear kind of on his left inner thigh."

### B. T.B.'s Pleas

{¶10} Officer Chitwood then filed two complaints against T.B. in the juvenile court.

{¶11} The first, numbered 24/2312-01 X, charged that T.B. had carried a concealed weapon in violation of R.C. 2923.12, a fourth-degree felony for an adult. For simplicity, we shall refer to this as the "concealed-carry case."

{¶12} The second complaint, numbered T/24/1379-01 X, charged that T.B. had violated Ohio's pedestrian right-of-way law, R.C. 4511.48, which would be a minor misdemeanor for an adult. We shall refer to this as the "jaywalking case."

{¶13} T.B. initially entered a plea of "admit" to both charges, and a magistrate issued February 24, 2025 decisions accepting those pleas and adjudicating him delinquent in both cases. The next day, however, T.B. filed motions to withdraw both pleas. After a hearing, the juvenile court agreed to "grant [T.B.'s] motion to withdraw the plea," and set the matter "for a motion to suppress." The juvenile court memorialized this decision in a March 5, 2025 journal entry in T.B.'s concealed-carry case, but made no such entry in his jaywalking case.

{¶14} Six days later, the juvenile court issued entries in both cases purporting to adopt the magistrate's decisions accepting T.B.'s pleas and adjudicating him

delinquent. A later entry clarified that the juvenile court's "case management software [had] produced and filed" this March 11 entry, and that the entry "was not intended to alter the Court's Order permitting T.B. to withdraw his plea of admit or to disrupt the Dispositional Order dated March 5, 2025."

### C. Suppression & Merits Hearing

**{¶15}** With his plea withdrawn, T.B. filed a motion to suppress evidence derived from the seizure and search in his concealed-carry case. On April 10, 2025, the juvenile court held a hearing on the motion and the merits of the State's complaint, but called only the concealed-carry case at the start of the hearing, announcing that it had "24-2312, count one, CCW, set for motion and trial today."

**{¶16}** During the motion-to-suppress hearing, T.B. called Officers Hoffbauer and Chitwood and introduced Officer Chitwood's BWC footage. The juvenile court denied T.B.'s motion, reasoning that the officers had adequate grounds to briefly detain T.B. to cite him for jaywalking, and that they could reasonably have suspected he was armed.

**{¶17}** The juvenile court then took further evidence on the merits of the State's complaint. The State called only one additional witness, Officer Dezarn, who testified that he arrived at the scene of the arrest with Officer Hoffbauer shortly after the uniformed officers had taken T.B.'s weapon. The other officers then gave Officer Dezarn the gun they said had come from T.B. Officer Dezarn then placed it in a bag, brought it to the station downtown, test-fired it, and determined that it was operable.

**{¶18}** The State moved to admit the gun and corresponding firearm report into evidence. T.B. objected to the admission of the gun, arguing that, because Officer Dezarn had arrived after the gun was already in police custody, his testimony was insufficient to authenticate it as T.B.'s. T.B. also objected to the State's attempt to

introduce the report through Officer Dezarn, as it listed Officer Hoffbauer as its author. The juvenile court overruled the former and sustained the latter—admitting the gun, but excluding the report.

**{¶19}** After hearing the evidence, the juvenile court found that T.B. had committed the concealed-carry violation. It found him delinquent and entered a dispositional order in the concealed-carry case on April 10, 2025.

**{¶20}** In its oral ruling following the hearing, the juvenile court also found that T.B. had committed the jaywalking offense, but it entered no further dispositional orders in the jaywalking case.

### D. *Proceedings on Appeal*

**{¶21}** T.B. then filed a timely notice of appeal from the April 10 dispositional order on the concealed-carry charge in the appeal numbered C-250279. Ten days later, T.B. sought leave to file a delayed appeal from the juvenile court's March 11 order approving the magistrate's order accepting his plea and adjudicating him delinquent in his jaywalking case, in the appeal numbered C-250288. We allowed this second appeal and consolidated it with the first.

**{¶22}** We also issued an order directing the juvenile court to rule on the pending motions to clarify its record in both the concealed-carry and jaywalking cases. It did so and certified the supplemented records to us.

### II. ANALYSIS

**{¶23}** In these consolidated appeals, T.B. raises four assignments of error, challenging (1) the juvenile court's denial of his motion to suppress evidence obtained from the search and seizure, (2) the juvenile court's denial of his motion to exclude the firearm for lack of authentication, (3) the sufficiency and weight of the evidence supporting the juvenile court's finding that the weapon was operable, and (4) the

juvenile court's failure to allow him to withdraw his plea in the jaywalking case.

## A. First Assignment of Error:
### Motion to Suppress

{¶24} Both the Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution prohibit unreasonable searches and seizures of the person, and evidence derived from such unconstitutional searches or seizures may be suppressed at trial. *See State v. Rogers*, 2022-Ohio-4535, ¶ 25 (1st Dist.); *State v. Brown*, 2003-Ohio-3931, ¶ 25.

{¶25} In his first assignment of error, T.B. argues that the seizure and subsequent search of his person were constitutionally unreasonable, and that the juvenile court should therefore have suppressed the evidence they yielded—especially the gun found on his person. In addressing such a mixed question of law and fact, we apply a mixed standard of review. First, we review the lower court's factual findings merely to ensure they were supported by competent, credible evidence. Then, we consider de novo any questions of law or the application of the law to the facts. *In re J.T.*, 2023-Ohio-2695, ¶ 15 (1st Dist.); *State v. Burnside*, 2003-Ohio-5372, ¶ 8.

### 1. Seizure

{¶26} Neither party disputes that T.B. was seized when Officer Chitwood approached the four young men. While the parties discuss several justifications for this seizure, one was sufficient to make it reasonable: Officer Chitwood was lawfully permitted to perform a limited seizure of T.B.'s person to cite him for jaywalking.

{¶27} Ohio law prohibits pedestrians from crossing a street "at any place except in a marked crosswalk" if they are "[b]etween adjacent intersections at which

8

highway traffic signals are in operation."[1] R.C. 4511.48(C). A separate provision makes it unlawful for a pedestrian to "disobey the instructions of any traffic control device," R.C. 4511.12(A)—for example, by using a crosswalk in spite of a "steady upraised hand signal indication," R.C. 4511.14(C).[2]

{¶28} Violating either provision is a minor misdemeanor. But, under R.C. 2935.26(A), an officer "shall not arrest" a minor misdemeanant unless they fall within one of several listed exceptions. Arresting a minor misdemeanant absent statutory authority is an unreasonable seizure within the meaning of Article I, Section 14 of the Ohio Constitution. *Brown*, 2003-Ohio-3931, at ¶ 21-22, 25.[3] But an officer may perform a brief detention of such an individual for the limited purpose of "issu[ing] the citation contemplated by R.C. 2935.26." *State v. Bradford*, 2014-Ohio-5527, ¶ 22 (10th Dist.), citing *State v. Riggins*, 2004-Ohio-4247, ¶ 10 (1st Dist.).

{¶29} Officer Chitwood never witnessed T.B.'s jaywalking violation; he relied upon the information communicated to him by Officer Hoffbauer. This was permissible under the "fellow-officers rule," which permits an officer to "initiate a stop based on the reasonable suspicion of criminal activity through sources other than his own observations, including radio broadcasts." (Cleaned up.) *In re M.P.*, 2014-Ohio-2846, ¶ 10 (1st Dist.); *see also United States v. Hensley*, 469 U.S. 221, 232-233 (1985).

{¶30} But, under the fellow-officers rule, the *requesting officer* must have

---

[1] "'Highway traffic signal,' means a power-operated traffic control device by which traffic is warned or directed to take some specific action," including a stoplight. R.C. 4511.01(MMM).

[2] The "special pedestrian control signals" described in R.C. 4511.14 clearly qualify as "traffic control devices," which R.C. 4511.01(QQ) defines to include any "device that uses colors, shapes, [or] symbols . . . for the primary purpose of communicating a regulatory, warning, or guidance message to road users on a street."

[3] In this respect the Ohio Constitution is more protective than the federal. *See Brown*, 2003-Ohio-3931, at ¶ 21-22 (reading Ohio Const., art. I, § 14, not to permit officers to arrest based on minor misdemeanors, even though such arrests do not violate U.S. Const., amend. IV, as interpreted in *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001)).

9

reasonable suspicion, if the *responding officer's* stop is to be lawful. *In re M.P.* at ¶ 10, citing *Hensley* at 232. Thus, because Officer Chitwood lacked personal knowledge that would have allowed him to stop T.B., we must consider whether Officer Hoffbauer had grounds to conclude that T.B. had committed a jaywalking offense.

**{¶31}** Officer Hoffbauer testified that she had seen the four youths "commit[] a jaywalking violation." The juvenile court appeared to credit this testimony in its oral ruling. T.B. argues that Officer Hoffbauer's testimony was not competent and credible, because her narrative of the jaywalking was self-contradictory. Admittedly, Officer Hoffbauer was not clear as to *what sort* of crossing violation T.B. had committed. First, she said "[t]hey walked south across Rockdale Avenue near Burnet when there was a crosswalk within ten/twelve steps readily available," suggesting a R.C. 4511.48(C) violation. But then, without prompting, Officer Hoffbauer proffered an alternative rationale suggesting a R.C. 4511.12(A) violation: "Even if they did get to the crosswalk, when they did walk south, it was also a no-walk sign in the crosswalk, but they were still outside of the marked crosswalk."

**{¶32}** Officer Hoffbauer's presentation of alternative infractions did not necessarily prohibit the juvenile court from crediting her testimony that she had seen the young men commit a traffic infraction. In the BWC video, T.B. and his compatriots protested Officer Chitwood's claims that they had not used the crosswalk, but did not dispute his contention that they did so without a walk light. Given Officer Hoffbauer's reported proximity to the alleged jaywalking, the juvenile court could easily credit her testimony that T.B. and his friends had disobeyed the instructions of a traffic control device in violation of R.C. 4511.12(A).

**{¶33}** The juvenile court had competent, credible evidence that Officer Hoffbauer had witnessed T.B. commit a minor crossing misdemeanor. Based on that

fact, Officer Hoffbauer could lawfully stop T.B. to cite him under R.C. 2935.26(A) or instruct Officer Chitwood to do the same. The juvenile court therefore did not err in holding that Officer Chitwood's initial seizure of T.B. was "reasonable" under the Fourth Amendment and Ohio Constitution.

### 2. Search

**{¶34}** But just because Officer Chitwood had the authority to seize T.B. does not mean he had authority to *search* T.B. Under R.C. 2935.26(A), his seizure of T.B. could not become an *arrest*, so a "search incident to arrest" was out of the question. *See Riggins*, 2004-Ohio-4247, at ¶ 10 (1st Dist.); *Brown*, 2003-Ohio-3931, at ¶ 16.

**{¶35}** Nevertheless, if an officer lawfully seizes an individual, and if the officer has a reasonable, articulable suspicion that the individual "may be armed and presently dangerous," then the officer may perform a "limited protective search" for weapons on the detainee's person—often called a "*Terry* frisk." *State v. Henson*, 2022-Ohio-1571, ¶ 15 (1st Dist.); *see generally Terry v. Ohio*, 392 U.S. 1 (1968). This reasonable, articulable suspicion is something less than probable cause, but more than an "inchoate and unparticularized suspicion or hunch." (Cleaned up.) *Henson* at ¶ 17; *accord State v. Hawkins*, 2019-Ohio-4210, ¶ 20. Sometimes the very suspicion that justifies a stop will also furnish suspicion for a pat-down—as when an officer has reasonable suspicion to believe the defendant just fired a gun. *See*, *e.g.*, *State v. Hall*, 2025-Ohio-1644, ¶ 26 (1st Dist.); *State v. Hairston*, 2019-Ohio-1622, ¶ 9.

**{¶36}** Reasonable suspicion (or even probable cause) to believe an individual was *jaywalking*, however, is not a basis for a *Terry* frisk. The officers here had to show additional, particularized facts "that would cause a reasonable officer to believe that his or her safety was in danger" while performing the jaywalking stop. *Henson* at ¶ 15.

**{¶37}** The State offers two theories as to why Officer Chitwood was permitted

to frisk T.B.

**{¶38}** First, the State argues that the presence of a firearm on T.B.'s associate justified the search under the "automatic-companion rule." Under this proposed rule, "[a]ll companions of [an] arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat-down' reasonably necessary to give assurance that they are unarmed." *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971).

**{¶39}** We have never adopted such a bright-line rule. Nevertheless, the State invites us to do so here and hold that the gun on T.B.'s companion in the tan hoodie automatically permitted the officers to frisk T.B. We decline that invitation.

**{¶40}** Despite the confident assertions in the State's brief, there is reason to question the soundness of the automatic-companion rule. The State relies largely on two published decisions from our sister districts that appear to adopt the automatic-companion rule—one with respect to searches incident to arrest, *State v. Leet*, 2020-Ohio-1404, ¶ 19 (2d Dist.), and one with respect to *Terry* frisks, *In re D.S.*, 2013-Ohio-5740, ¶ 14-15 (8th Dist.).[4] But the Second and Eighth District's opinions fail to mention the significant contrary authority from other jurisdictions. For example, courts of last resort in many of our sister states have rejected or declined to adopt the automatic-companion rule.[5] Several federal appellate decisions have

---

[4] The State also relies on two *un*published Ohio decisions. One of these, *State v. Barlow*, 1988 Ohio App. LEXIS 124, *4 (8th Dist. Jan. 21, 1988), also comes out of the Eighth District, and its holding would later become precedential in *In re D.S.*, 2013-Ohio-5740 (8th Dist.). The other, *State v. Kidd*, 1989 Ohio App. LEXIS 3751, *5 (10th Dist. Sept. 28, 1989), comes from the Tenth District and, as far as we can tell, has not been cited in any published opinion in the 36 years since its issuance.

[5] The courts of last resort in Nevada, Washington, Minnesota, and Massachusetts have all rejected the automatic-companion rule. *State v. Dubuc*, 581 P.3d 437, 441 (Nev. 2025) (taking the "opportunity to affirmatively reject" the rule); *State v. Flores*, 186 Wash.2d 506, 522, fn. 5 (2016) ("reject[ing] the automatic companion rule" because it was "inconsistent with [that court's] precedent"); *In re Welfare of C.T.B.*, 24 N.W.3d 651, 656 (Minn. 2025) ("we have rejected the automatic-companion rule, adopted by some jurisdictions"); *Commonwealth v. Ng*, 420 Mass. 236,

likewise rejected it—including four decades of Sixth Circuit precedent.[6] And while decisions from the Fourth, the Ninth, and (arguably) the Seventh Circuits appear to adopt the rule,[7] all three did so prior to *Ybarra v. Illinois*, 444 U.S. 85 (1979), which held that a defendant's "mere propinquity to others independently suspected of criminal activity" was insufficient to support probable cause to search, *id.* at 91, or even reasonable suspicion to frisk, *id.* at 94.

**{¶41}** But we need not determine the viability of the automatic-companion rule in this case, because we agree with the State's second argument: under the totality

---

237-238 (1995) ("We agree with the Appeals Court's conclusion, which is supported by opinions that reject an automatic right to search a companion."). The Alaska Court of Appeals has done likewise. *Eldridge v. State*, 848 P.2d 834, 837-838 (Alaska App. 1993). And the high courts of Connecticut and Pennsylvania have avoided resolving the issue, but expressed skepticism of the automatic-companion rule. *Commonwealth v. Shiflet*, 543 Pa. 164, 172, fn. 4 (1995); *State v. Kelly*, 313 Conn. 1, 21, fn. 16 (2014). The Arizona Court of Appeals and the Wyoming Supreme Court, by contrast, have adopted the *Berryhill* rule. *State v. Clevidence*, 153 Ariz. 295, 298 (Ariz.App. 1987) ("The right to a limited search for weapons extends to a suspected criminal's companions at the time of arrest."); *Perry v. State*, 927 P.2d 1158, 1166 (Wyo. 1996) ("We adopt the automatic companion rule justifying pat-down searches of companions of arrested persons . . . ."). And finally, we note that the Kentucky Supreme Court avoided adopting a broad automatic-companion rule that would apply to cases like this one. Instead, it has adopted a version of the rule that applies *only* when "the driver of a vehicle has been lawfully arrested and the passengers of the vehicle have been lawfully expelled in preparation for a lawful search." *Owens v. Commonwealth*, 291 S.W.3d 704, 712 (Ky. 2009). And the Kentucky Court of Appeals has dutifully declined to extend *Owens* beyond this limited context. *Reynolds v. Commonwealth*, 393 S.W.3d 607, 612 (Ky.App. 2012) (holding that, because the case did not involve a "factual scenario where the driver of the vehicle had been arrested and the vehicle is being lawfully searched," *Owens* did not apply).

[6] *See United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985) ("We do not believe that the *Terry* requirement of reasonable suspicion under the circumstances has been eroded to the point that an individual may be frisked based upon nothing more than an unfortunate choice of associates." (Cleaned up.)); *United States v. Wilson*, 506 F.3d 488, 494 (6th Cir. 2007); *United States v. Underwood*, 129 F.4th 912, 932 (6th Cir. 2025) ("There is not, for instance, an automatic companion rule allowing police to search the companions of any armed individual."); *United States v. Tharpe*, 536 F.2d 1098, 1101 (5th Cir. 1976), *overruled on other grounds by United States v. Causey*, 834 F.2d 1179 (5th Cir. 1987) (declining to "go so far as the Ninth Circuit's rule of general justification conferring categorical reasonableness upon searches of all companions of the arrestee as being incident to the arrest of the other"); *United States v. Flett*, 806 F.2d 823, 827 (8th Cir. 1986) ("We decline to adopt the 'automatic companion' rule."). The First and Tenth Circuits have never addressed the rule, but district courts in both jurisdictions have suggested that they do not believe such a rule would be consistent with circuit and Supreme Court precedent. *See United States v. Matias-Maestres*, 738 F.Supp.2d 281, 298 (D.P.R. 2010); *United States v. Maddox*, D.N.M. No. 02-1592, 2003 U.S. Dist. LEXIS 30165, *8-9 (June 4, 2003).

[7] *Berryhill*, 445 F.2d at 1193 (9th Cir.); *United States v. Pom*, 484 F.2d 919, 922 (4th Cir. 1973); *United States v. Simmons*, 567 F.2d 314, 319 (7th Cir. 1977) (noting that the *Berryhill* "rationale may be sufficient where a search is limited to a 'pat down'").

of the circumstances found by the juvenile court, the officers had reasonable suspicion that T.B. *in particular* was unlawfully carrying a dangerous weapon.

**{¶42}** Specifically, Officer Hoffbauer testified that she had "observed [T.B.] with his phone in another pocket," separate from "a bulge in his waistband area, the front waistband area, where it is common that individuals carry firearms." She further testified that the bulge in the "waistband areas" of both T.B. and his friend in the tan hoodie were "very consistent with carrying a firearm," and that the two young men touched or grabbed that area of their pants, as if to "make sure [the gun was] there, make sure it's not falling."

**{¶43}** Officer Chitwood then testified that Officer Hoffbauer relayed this information to him over the radio, specifically identifying the young man in the tan hoodie and T.B., who was in a dark-brown hoodie, as "possibly having firearms on them." As Officer Chitwood approached T.B. and his companions, he saw a prominent and unusual bulge near the waistband of the young man in the tan hoodie. Based on this bulge and Officer Hoffbauer's communication, he frisked this individual and felt a gun.

**{¶44}** But Officer Chitwood never testified that he personally witnessed a bulge in T.B.'s pants, and none is apparent from his BWC footage.

**{¶45}** The State contends, however, that T.B. exhibited "furtive movements" on the BWC video. Specifically, it asserts that T.B.'s effort to open the door to the community center and call for "Pastor Tate" were movements from which Officer Chitwood might conclude that T.B. was armed and dangerous.

**{¶46}** We reject the notion that such conduct could have aroused a reasonable suspicion that T.B. was armed and presently dangerous. Officer Chitwood testified that he *knew* the building at issue was a community center, church, daycare, or similar

facility. He witnessed T.B., a juvenile, open the door to that facility and ask, by name, for a pastor to come and supervise his encounter with the police. As even the State conceded at oral argument, the mere fact that a juvenile seeks the presence of a responsible adult during a police encounter is not itself unreasonable or suspicious. And nothing about the circumstances here made it particularly suspicious. Surely the officers do not believe that asking for *the church's pastor* suggests danger. And nothing about T.B.'s surrounding efforts to open the door could reasonably be construed as "furtive"—not his calm demeanor before or while opening the door, nor his prompt compliance once Officer Chitwood asked for him to remain outside.

{¶47} But even disregarding T.B.'s efforts to call an adult, we hold that the bulge that Officer Hoffbauer observed on T.B.'s person, coupled with the unlawful gun Officer Chitwood felt while frisking his companion in the tan hoodie, were sufficient to justify the officer in frisking T.B.

{¶48} T.B. argues, however, that we should not consider the officers' observations about the bulge on his companion in the tan hoodie, because the bulge they described was not where the companion's gun was ultimately found. But even if we assumed, as T.B. contends, that the video contradicted the officers' testimony about the companion's bulge, it would make no difference here. By the time Officer Chitwood reached T.B., he had frisked the companion and *felt* what he believed to be a gun. Thus, Officer Chitwood clearly had reason to believe, prior to frisking T.B., that T.B.'s companion was armed.

{¶49} T.B. also argues that the juvenile court erred in crediting Officer Hoffbauer's testimony that she had observed a conspicuous bulge in T.B.'s waistband area. Specifically, T.B. notes that no such bulge is visible in the BWC footage, and that T.B.'s long, baggy sweatshirt makes it unlikely Officer Hoffbauer could have seen an

outline of a handgun. And if we should discredit Officer Hoffbauer's "bulge" testimony and remove it from the totality of the circumstances, then Officer Chitwood would have lacked an individualized basis for his reasonable suspicion that T.B. was armed.

{¶50} We agree that the video does not explicitly support Officer Hoffbauer's bulge testimony, but we do not think it necessarily *contradicts* that testimony either. The period of time when Officer Hoffbauer was observing the young men was not captured on camera, and neither party asked Officer Hoffbauer to clarify *how* she saw the gun through the baggy sweatshirt. Perhaps T.B. lifted his sweatshirt or stretched his arms during that time. In the absence of testimony on this point, the question boils down to a pure credibility determination: Was Officer Hoffbauer lying or mistaken when she said she saw a bulge in T.B.'s waistband? The juvenile court was in the best position to make that call, and it found her testimony credible. Circumstances may have furnished reason for doubt, but none flatly disproved Officer Hoffbauer's description of what she saw.

{¶51} Accordingly, we hold that the evidence in the record did not *require* the juvenile court to disbelieve Officer Hoffbauer's testimony that she saw a bulge consistent with a gun near T.B.'s waistband. We further hold that Officer Hoffbauer's observation of the gun-like bulge in T.B.'s and his companion's pants, coupled with T.B.'s minority and the subsequent discovery of the gun on T.B.'s companion, allowed Officer Chitwood to reasonably suspect that T.B. was armed with an unlawful, concealed weapon. Officer Chitwood's frisk of T.B. was therefore reasonable under the Fourth Amendment and the Ohio Constitution, and the juvenile court was correct to deny T.B.'s motion to suppress. T.B.'s first assignment of error is overruled.

### B. Second Assignment of Error:
### Authentication of the Gun

{¶52} In his second assignment of error, T.B. argues that the State failed to properly authenticate the firearm allegedly found on his person under Evid.R. 901. We review the juvenile court's decision to admit the gun for an abuse of discretion. *See State v. Searles*, 2019-Ohio-3109, ¶ 7 (1st Dist.).

{¶53} The proponent of evidence bears the burden of authenticating it by producing "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A). This may include, when relevant, proving up a chain of custody. *See State v. Richey*, 1992-Ohio-44, ¶ 38. But the burden is light. "Authentication is 'a very low threshold, which is less demanding than the preponderance of the evidence.'" *State v. Patterson*, 2018-Ohio-3348, ¶ 13 (1st Dist.), quoting *State v. White*, 2004-Ohio-6005, ¶ 61 (4th Dist.). That threshold can be surmounted by circumstantial evidence, *id.*, and does not require the State "to prove a perfect, unbroken chain of custody." (Cleaned up.) *State v. Gross*, 2002-Ohio-5524, ¶ 57. If the proven links in the chain provide prima facie evidence that "the matter in question is what its proponent claims," Evid.R. 901(A), then any weaknesses or "breaks in the chain of custody go to the weight, rather than the admissibility." *State v. Crossty*, 2017-Ohio-8382, ¶ 30 (1st Dist.).

{¶54} The heart of T.B.'s authentication argument is that Officer Dezarn offered the only testimony authenticating the gun introduced into evidence as the one taken from T.B.'s person, even though he had no personal knowledge to that effect.

{¶55} If we had only Officer Dezarn's testimony to rely upon, we would be compelled to agree with T.B. Officer Dezarn's relevant testimony was as follows:

> PROSECUTOR: Officer Dezarn, for in-court identification

purposes, you were on scene with this firearm; is that correct?

OFFICER DEZARN: Yes.

PROSECUTOR: And how did you become—how did you come into possession of this firearm?

OFFICER DEZARN: I retrieved it from another officer who was on scene.

PROSECUTOR: Okay. And was this the firearm that the officer had taken off of [T.B.]?

OFFICER DEZARN: Yes.

PROSECUTOR: And was that your understanding when you were receiving this firearm?

OFFICER DEZARN: That's correct.

The problem is that Officer Dezarn elsewhere said that he "showed up on scene after [T.B.] was in handcuffs and the firearm was recovered." We know from the video that a first gun was recovered from the individual in the tan hoodie, before a *second* gun was found on T.B. Thus, if Officer Dezarn showed up *after* T.B.'s gun was recovered, then he *could not* have personal knowledge as to whether the gun he was given was the one taken from T.B.—he could only have *been told* it was.

{¶56} We have a word for out-of-court statements repeated or relied upon to prove what they assert: hearsay. And we generally presume that a juvenile court, sitting as factfinder, does not rely upon improper hearsay evidence in reaching its factual conclusions. *See State v. Rouzier*, 2021-Ohio-1466, ¶ 19 (1st Dist.), citing *State v. White*, 15 Ohio St.2d 146, 151 (1968). Thus, we presume that the juvenile court in this case *disregarded* the embedded hearsay statement in Officer Dezarn's testimony, which linked the gun in evidence to the one taken out of T.B.'s pants. Without that

18

link, however, Officer Dezarn's testimony proved only that he received and tagged one of two guns recovered at the scene of T.B.'s arrest.

{¶57} Fortunately for the State, Officer Chitwood's BWC footage, unlike Officer Dezarn's testimony, *does* establish a rough chain of custody. In it, we see an officer in blue gloves remove a gun from T.B.'s companion's pants. We then see another officer with a black glove on his right hand leaning toward T.B. and lifting his shirt. T.B.'s body blocks our view of what happens next, but when the camera shows the black-gloved officer again, he is holding a handgun in his gloved hand. Next to him another officer puts on green gloves. The black-, green-, and blue-gloved officers then interact. Much of this interaction is obstructed by T.B.'s body, but we can see the blue-gloved officer holding the same handgun (presumably the one taken from the young man in the tan hoodie) for most of this interaction. A few seconds later, when T.B. moves once more, the black-gloved officer's hands are empty, and the green-gloved officer has a gun in his hand.

{¶58} About a minute later, the same, green-gloved officer can be seen in the background passing a handgun to Officer Dezarn, who is wearing plain clothes and a gun vest. Another minute later, the camera captures Officer Dezarn, holding a gun in a plastic bag and an evidence envelope in his hand, as he enters the police vehicle holding T.B.

{¶59} We hold that this video provided sufficient circumstantial evidence that the gun Officer Dezarn bagged and tagged was the gun taken from T.B.'s person. And we hold that the remainder of Officer Dezarn's testimony was sufficient to link the weapon he bagged to the one he identified in court. T.B.'s second assignment of error is thus overruled.

### C. Third Assignment of Error:
### Evidence of Operability

**{¶60}** In his third assignment of error, T.B. challenges the weight and sufficiency of the juvenile court's finding that the gun taken from his person was operable—a necessary element for his concealed-carry conviction. To determine whether the State's evidence was sufficient, we ask whether, if believed and viewed in the light most favorable to the State, it could have satisfied the elements the State had to prove at trial. *State v. Jones*, 2021-Ohio-3311, ¶ 16; *State v. Chambers*, 2025-Ohio-4737, ¶ 18 (1st Dist.). And to assess whether the court's findings were against the manifest weight of the evidence, we review the entire record to determine whether the court below lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice. *State v. Thompkins*, 1997-Ohio-52, ¶ 25; *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

**{¶61}** Officer Dezarn testified that he test-fired the gun recovered from T.B. and found that it was operable. T.B. argues that this was not enough.

**{¶62}** Part of T.B.'s argument simply rehashes his argument on authentication—if we cannot know whether the gun officer Dezarn recovered and test-fired was T.B.'s, then Officer Dezarn's test-firing tells us very little. But we hold that the evidence we described above as supporting authentication was also legally sufficient to sustain a finding that the gun Officer Dezarn bagged and tagged came from T.B. And since the record includes no affirmative evidence to the contrary, the same finding was not against the manifest weight of the evidence.

**{¶63}** T.B. also argues that the evidence cast doubt on Officer Dezarn's testimony that he test-fired the weapon identified in court. As support, T.B. points to the firearm-testing report that documented the test-firing, which he claims listed

Officer Hoffbauer as its author, and not Officer Dezarn. But T.B. *successfully objected* to the admission of the firearm-testing report at trial, so that report is not in evidence, and there is no sworn testimony about its authorship. All we have is Officer Dezarn's testimony that he successfully fired the gun admitted as State's Exhibit 1. That was sufficient to support a finding that the weapon T.B. had possessed was operable, and T.B. points to no significant record evidence that weighed against such a finding.

**{¶64}** T.B.'s third assignment of error is therefore overruled.

### D. Fourth Assignment of Error:
### Motion to Withdraw Jaywalking-Case Plea

**{¶65}** In his fourth and final assignment of error, T.B. argues that the juvenile court erred by failing to rule on his motion to withdraw his plea of "admit" in the jaywalking case.

**{¶66}** T.B. moved to withdraw his pleas to both charges on February 25. On March 5, the juvenile court granted his motion in the concealed-carry case, but issued no comparable entry in the jaywalking case. Then, on March 11, the juvenile court issued orders in both cases adopting and approving the magistrate's February 24 decisions, which had accepted T.B.'s pleas. The juvenile court later entered a clarification entry explaining that its March 11 entry "was not intended to alter the Court's Order permitting T.B. to withdraw his plea." The juvenile court heard the concealed-carry case on its merits on April 10 and entered a final dispositional order later that day.

**{¶67}** Unlike the concealed-carry case, however, the jaywalking case was not called for hearing on April 10, and the juvenile court issued no further dispositional order in the jaywalking case on that date. The juvenile court's March 11 order, which adopted the magistrate's decision to accept T.B.'s plea to the jaywalking charge, is thus

the only final order of disposition in the jaywalking-case record.

**{¶68}** Prior to its March 11 dispositional order, the juvenile court had not resolved T.B.'s motion to withdraw his plea of admit in the jaywalking case.

**{¶69}** Generally, "when a trial court fails to rule upon a pretrial motion, it may be presumed that the court overruled it." *State ex rel. Cassels v. Dayton City School Dist. Bd. of Edn.*, 1994-Ohio-92, ¶ 23, citing *Newman v. Al Castrucci Ford Sales*, 54 Ohio App.3d 166, 169 (1st Dist. 1988). The State urges us to draw the opposite inference here, however. It insists that, "because the trial court proceeded with the motion to suppress and trial," we must presume the court *granted* T.B.'s motion to withdraw sub silentio. We might agree if the jaywalking case had proceeded to trial and judgment, as the juvenile court could not have both accepted T.B.'s plea of admit *and* tried the charge on its merits. But, as already explained, T.B.'s jaywalking case was resolved in the March 11 dispositional order—a month before the April 10 trial even began—based on the very plea that T.B. had asked to withdraw.

**{¶70}** We therefore hold that, by entering the March 11 dispositional order in T.B.'s jaywalking case, the juvenile court implicitly denied T.B.'s February 25 motion to withdraw his jaywalking-case plea.

**{¶71}** We next ask whether this implicit denial was error. We review such a ruling, like similar rulings under Crim.R. 32.1, for an abuse of discretion. *See, e.g.*, *In re D.R.H.*, 2023-Ohio-1694, ¶ 52 (7th Dist.), citing *State v. Xie*, 62 Ohio St.3d 521 (1992); *In re T.W.*, 2006-Ohio-3897, ¶ 5 (12th Dist.). Thus, we may reverse the juvenile court's judgment only if its decision or reasoning process was unreasonable, arbitrary, or unconscionable. *In re J.S.,* 2024-Ohio-4887, ¶ 14 (1st Dist.). In this case, the juvenile court's denial fit that bill.

**{¶72}** Juveniles are presumptively permitted to withdraw their pleas prior to

a final order of disposition. Because no juvenile rule governs how a juvenile may withdraw their plea, courts look to the criminal rules for analogy and guidance. *See In re D.R.H.* at ¶ 50. Under Crim.R. 32.1, courts have long held that "a defendant's presentence motion to withdraw his guilty plea should be *freely and liberally granted.*" (Emphasis in original.) *State v. Barnes*, 2022-Ohio-4486, ¶ 21; *accord Xie* at 527. So, "when a defendant pleads guilty to one or more crimes and later wants to withdraw that plea before he has been sentenced, the trial court should permit him to withdraw his plea." *Barnes* at ¶ 21. The Ohio Supreme Court has described this as a "presumption" in favor of granting a presentence motion to withdraw a plea, which may be rebutted under certain circumstances. *Id.* at ¶ 21-22.

{¶73} On February 25, when T.B. filed his motion, the juvenile court had not yet entered an order of disposition for T.B. (the juvenile equivalent of imposing a sentence). So T.B. retained his presumptive, though qualified, right to withdraw his pleas. Although T.B. sought to withdraw both pleas, the juvenile court only granted his motion in the concealed-carry case, and implicitly denied his motion in the jaywalking case. The court offered no reason why T.B. should not be allowed to withdraw his plea in the jaywalking case, let alone why that case should be treated any differently than the concealed-carry case.

{¶74} Given (1) T.B.'s presumptive right to withdraw his plea prior to disposition, (2) the trial court's lack of explanation for denying his motion to do so in the jaywalking case, and (3) the juvenile court's disparate treatment of the motions filed in T.B.'s two cases, we hold that the juvenile court's implicit denial of T.B.'s motion to withdraw his jaywalking-case plea was unreasoned, arbitrary, and an abuse of discretion. *Compare State v. Wright*, 2004-Ohio-7023, ¶ 11 and 14 (8th Dist.) (trial court abused its discretion when it "did not explicitly rule upon," hold a hearing on, or

"determine whether there was a reasonable and legitimate basis for" defendant's motion to withdraw his plea).

**{¶75}** T.B.'s fourth assignment of error is sustained.

### III. CONCLUSION

**{¶76}** Having overruled T.B.'s first three assignments of error, we affirm the juvenile court's April 10, 2025 dispositional order in the concealed-carry case, appealed in the case numbered C-250279.

**{¶77}** However, because we sustain T.B.'s fourth assignment of error, we reverse the juvenile court's March 11, 2025 dispositional order in the jaywalking case, appealed in the case numbered C-250288, and we remand the cause to the trial court with instructions to grant T.B.'s February 25, 2025 motion to withdraw his plea.

Judgment accordingly.

**NESTOR** and **MOORE, JJ.,** concur.